*5 Justice Stevens
delivered the opinion of the Court.
California is one of at least nine States that authorize the use of marijuana for medicinal purposes.[1] The question presented in this case is whether the power vested in Congress by Article I, §8, of the Constitution “[t]o make all Laws which shall be necessary and proper for carrying into Execution” its authority to “regulate Commerce with foreign Nations, and among the several States” includes the power to prohibit the local cultivation and use of marijuana in compliance with California law.
I
California has been a pioneer in the regulation of marijuana. In 1913, California was one of the first States to prohibit the sale and possession of marijuana,[2] and at the end of the century, California became the first State to authorize limited use of the drug for medicinal purposes. In 1996, California voters passed Proposition 215, now codified as the Compassionate Use Act of 1996.[3] The proposition was de *6 signed to ensure that “seriously ill” residents of the State have access to marijuana for medical purposes, and to encourage Federal and State Governments to take steps toward ensuring the safe and affordable distribution of the drug to patients in need.[4] The Act creates an exemption from criminal prosecution for physicians,[5] as well as for patients and primary caregivers who possess or cultivate marijuana for medicinal purposes with the recommendation or approval of a physician.[6] A “primary caregiver” is a person who has consistently assumed responsibility for the housing, health, or safety of the patient.[7]
Respondents Angel Raich and Diane Monson are California residents who suffer from a variety of serious medical conditions and have sought to avail themselves of medical marijuana pursuant to the terms of the Compassionate Use *7 Act. They are being treated by licensed, board-certified family practitioners, who have concluded, after prescribing a host of conventional medicines to treat respondents’ conditions and to alleviate their associated symptoms, that marijuana is the only drug available that provides effective treatment. Both women have been using marijuana as a medication for several years pursuant to their doctors’ recommendation, and both rely heavily on cannabis to function on a daily basis. Indeed, Raich’s physician believes that forgoing cannabis treatments would certainly cause Raich excruciating pain and could very well prove fatal.
Respondent Monson cultivates her own marijuana, and ingests the drug in a variety of ways including smoking and using a vaporizer. Respondent Raich, by contrast, is unable to cultivate her own, and thus relies on two caregivers, litigating as “John Does,” to provide her with locally grown marijuana at no charge. These caregivers also process the cannabis into hashish or keif, and Raich herself processes some of the marijuana into oils, balms, and foods for consumption.
On August 15, 2002, county deputy sheriffs and agents from the federal Drug Enforcement Administration (DEA) came to Monson’s home. After a thorough investigation, the county officials concluded that her use of marijuana was entirely lawful as a matter of California law. Nevertheless, after a 3-hour standoff, the federal agents seized and destroyed all six of her cannabis plants.
Respondents thereafter brought this action against the Attorney General of the United States and the head of the DEA seeking injunctive and declaratory relief prohibiting the enforcement of the federal Controlled Substances Act (CSA), 84 Stat. 1242, 21 U. S. C. § 801 et seq., to the extent it prevents them from possessing, obtaining, or manufacturing cannabis for their personal medical use. In their complaint and supporting affidavits, Raich and Monson described the severity of their afflictions, their repeatedly futile attempts *8 to obtain relief with conventional medications, and the opinions of their doctors concerning their need to use marijuana. Respondents claimed that enforcing the CSA against them would violate the Commerce Clause, the Due Process Clause of the Fifth Amendment, the Ninth and Tenth Amendments of the Constitution, and the doctrine of medical necessity.
The District Court denied respondents’ motion for a preliminary injunction. Raich v. Ashcroft, 248 F. Supp. 2d 918 (ND Cal. 2003). Although the court found that the federal enforcement interests “wane[d]” when compared to the harm that California residents would suffer if denied access to medically necessary marijuana, it concluded that respondents could not demonstrate a likelihood of success on the merits of their legal claims. Id., at 931.
A divided panel of the Court of Appeals for the Ninth Circuit reversed and ordered the District Court to enter a preliminary injunction.[8] Raich v. Ashcroft, 352 F. 3d 1222 (2003). The court found that respondents Had “demonstrated a strong likelihood of success on their claim that, as applied to them, the CSA is an unconstitutional exercise of Congress’ Commerce Clause authority.” Id., at 1227. The Court of Appeals distinguished prior Circuit cases upholding the CSA in the face of Commerce Clause challenges by focusing on what it deemed to be the “separate and distinct class of activities” at issue in this case: “the intrastate, noncommercial cultivation and possession of cannabis for personal medical purposes as recommended by a patient’s physician pursuant to valid California state law.” Id., at 1228. The *9 court found the latter class of activities “different in kind from drug trafficking” because interposing a physician’s recommendation raises different health and safety concerns, and because “this limited use is clearly distinct from the broader illicit drug market — as well as any broader commercial market for medicinal marijuana — insofar as the medicinal marijuana at issue in this case is not intended for, nor does it enter, the stream of commerce.” Ibid.
The majority placed heavy reliance on our decisions in United States v. Lopez, 514 U. S. 549 (1995), and United States v. Morrison, 529 U. S. 598 (2000), as interpreted by recent Circuit precedent, to hold that this separate class of purely local activities was beyond the reach of federal power. In contrast, the dissenting judge concluded that the CSA, as applied to respondents, was clearly valid under Lopez and Morrison; moreover, he thought it “simply impossible to distinguish the relevant conduct surrounding the cultivation and use of the marijuana crop at issue in this case from the cultivation and use of the wheat crop that affected interstate commerce in Wickard v. Filburn” 352 F. 3d, at 1235 (opinion of Beam, J.).
The obvious importance of the case prompted our grant of certiorari. 542 U. S. 936 (2004). The case is made difficult by respondents’ strong arguments that they will suffer irreparable harm because, despite a congressional finding to the contrary, marijuana does have valid therapeutic purposes. The question before us, however, is not whether it is wise to enforce the statute in these circumstances; rather, it is whether Congress’ power to regulate interstate markets for medicinal substances encompasses the portions of those markets that are supplied with drugs produced and consumed locally. Well-settled law controls our answer. The CSA is a valid exercise of federal power, even as applied to the troubling facts of this case. We accordingly vacate the judgment of the Court of Appeals.
*10 II
Shortly after taking office in 1969, President Nixon declared a national “war on drugs.”[9] As the first campaign of that war, Congress set out to enact legislation that would consolidate various drug laws on the books into a comprehensive statute, provide meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels, and strengthen law enforcement tools against the traffic in illicit drugs.[10] That effort culminated in the passage of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1236.
This was not, however, Congress’ first attempt to regulate the national market in drugs. Rather, as early as 1906 Congress enacted federal legislation imposing labeling regulations on medications and prohibiting the manufacture or shipment of any adulterated or misbranded drug traveling in interstate commerce.[11] Aside from these labeling restrictions, most domestic drug regulations prior to 1970 generally came in the guise of revenue laws, with the Department of the Treasury serving as the Federal Government’s primary enforcer.[12] For example, the primary drug control law, before being repealed by the passage of the CSA, was the Harrison Narcotics Act of 1914, 38 Stat. 786 (repealed 1970). The Harrison Act sought to exert control over the possession and sale of narcotics, specifically cocaine and opiates, by requiring producers, distributors, and purchasers to register with the Federal Government, by assessing taxes against *11 parties so registered, and by regulating the issuance of prescriptions.[13]
Marijuana itself was not significantly regulated by the Federal Government until 1937 when accounts of marijuana’s addictive qualities and physiological effects, paired with dissatisfaction with enforcement efforts at state and local levels, prompted Congress to pass the Marihuana Tax Act, 50 Stat. 551 (repealed 1970).[14] Like the Harrison Act, the Marihuana Tax Act did not outlaw the possession or sale of marijuana outright. Rather, it imposed registration and reporting requirements for all individuals importing, producing, selling, or dealing in marijuana, and required the payment of annual taxes in addition to transfer taxes whenever the drug changed hands.[15] Moreover, doctors wishing to prescribe marijuana for medical purposes were required to comply with rather burdensome administrative requirements.[16] Noncompliance exposed traffickers to severe federal penalties, whereas compliance would often subject them to prosecution under state law.[17] Thus, while the Marihuana Tax Act did not declare the drug illegal per se, the onerous administrative requirements, the prohibitively expensive taxes, and the risks attendant on compliance practically curtailed the marijuana trade.
Then in 1970, after declaration of the national “war on drugs,” federal drug policy underwent a significant transformation. A number of noteworthy events precipitated *12 this policy shift. First, in Leary v. United States, 395 U. S. 6 (1969), this Court held certain provisions of the Marihuana Tax Act and other narcotics legislation unconstitutional. Second, at the end of his term, President Johnson fundamentally reorganized the federal drug control agencies. The Bureau of Narcotics, then housed in the Department of the Treasury, merged with the Bureau of Drug Abuse Control, then housed in the Department of Health, Education, and Welfare (HEW), to create the Bureau of Narcotics and Dangerous Drugs, currently housed in the Department of Justice.[18] Finally, prompted by a perceived need to consolidate the growing number of piecemeal drug laws and to enhance federal drug enforcement powers, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act.[19]
Title II of that Act, the CSA, repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs. The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances.[20] Congress was particularly concerned with the *13 need to prevent the diversion of drugs from legitimate to illicit channels.[21]
To effectuate these goals, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. 21 U. S. C. §§ 841(a)(1), 844(a). The CSA categorizes all controlled substances into five schedules. §812. The drugs are grouped together based on their accepted medical uses, the potential for abuse, and their psychological and physical effects on the body. *14 §§811, 812. Each schedule is associated with a distinct set of controls regarding the manufacture, distribution, and use of the substances listed therein. §§821-830. The CSA and its implementing regulations set forth strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping. Ibid.; 21 CFR § 1301 et seq. (2004).
In enacting the CSA, Congress classified marijuana as a Schedule I drug. 21 U. S. C. § 812(c). This preliminary classification was based, in part, on the recommendation of the Assistant Secretary of HEW “that marihuana be retained within schedule I at least until the completion of certain studies now underway.”[22] Schedule I drugs are categorized as such because of their high potential for abuse, lack of any accepted medical use, and absence of any accepted safety for use in medically supervised treatment. § 812(b)(1). These three factors, in varying gradations, are also used to categorize drugs in the other four schedules. For example, Schedule II substances also have a high potential for abuse which may lead to severe psychological or physical dependence, but unlike Schedule I drugs, they have a currently accepted medical use. § 812(b)(2). By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study. § § 823(f), 841(a)(1), 844(a); see also United States v. Oakland Cannabis Buyers’ Cooperative, 532 U. S. 483, 490 (2001).
The CSA provides for the periodic updating of schedules and delegates authority to the Attorney General, after consultation with the Secretary of Health and Human Services, to add, remove, or transfer substances to, from, or between *15 schedules. §811. Despite considerable efforts to reschedule marijuana, it remains a Schedule I drug.[23]
1=1 1=( )=l
Respondents in this case do not dispute that passage of the CSA, as part of the Comprehensive Drug Abuse Prevention and Control Act, was well within Congress’ commerce power. Brief for Respondents 22,38. Nor do they contend that any provision or section of the CSA amounts to an unconstitutional exercise of congressional authority. Rather, respondents’ challenge is actually quite limited; they argue that the CSA’s categorical prohibition of the manufacture and possession of marijuana as applied to the intrastate manufacture and possession of marijuana for medical purposes pursuant to California law exceeds Congress’ authority under the Commerce Clause.
In assessing the validity of congressional regulation, none of our Commerce Clause cases can be viewed in isolation. As charted in considerable detail in United States v. Lopez, our understanding of the reach of the Commerce Clause, as well as Congress’ assertion of authority thereunder, has *16 evolved over time.[24] The Commerce Clause emerged as the Framers’ response to the central problem giving rise to the Constitution itself: the absence of any federal commerce power under the Articles of Confederation.[25] For the first century of our history, the primary use of the Clause was to preclude the kind of discriminatory state legislation that had once been permissible.[26] Then, in response to rapid industrial development and an increasingly interdependent national economy, Congress “ushered in a new era of federal regulation under the commerce power,” beginning with the enactment of the Interstate Commerce Act in 1887, 24 Stat. 379, and the Sherman Antitrust Act in 1890, 26 Stat. 209, as amended, 15 U. S. C. § 2 et seq.[27]
Cases decided during that “new era,” which now spans more than a century, have identified three general categories of regulation in which Congress is authorized to engage under its commerce power. First, Congress can regulate the channels of interstate commerce. Perez v. United States, 402 U.S. 146, 150 (1971). Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate *17 commerce. Ibid. Third, Congress has the power to regulate activities that substantially affect interstate commerce. Ibid.; NLRB v. Jones & Laughlin Steel Corp., 301 U. S. 1, 37 (1937). Only the third category is implicated in the case at hand.
Our case law firmly establishes Congress’ power to regulate purely local activities that are part of an economic “class of activities” that have a substantial effect on interstate commerce. See, e. g., Perez, 402 U. S., at 151; Wickard v. Filburn, 317 U. S. 111, 128-129 (1942). As we stated in Wick-ard, “even if appellee’s activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce.” Id., at 125. We have never required Congress to legislate with scientific exactitude. When Congress decides that the “‘total incidence’ ” of a practice poses a threat to a national market, it may regulate the entire class. See Perez, 402 U. S., at 154-155 (“ ‘[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so’ ” (quoting Westfall v. United States, 274 U. S. 256, 259 (1927))). In this vein, we have reiterated that when “ ‘a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.’ ” E. g., Lopez, 514 U. S., at 558 (quoting Maryland v. Wirtz, 392 U. S. 183, 196, n. 27 (1968); emphasis deleted).
Our decision in Wickard, 317 U. S. 111, is of particular relevance. In Wickard, we upheld the application of regulations promulgated under the Agricultural Adjustment Act of 1938, 52 Stat. 31, which were designed to control the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and consequent abnormally low prices. The regulations established an allotment of 11.1 acres for Filburn’s 1941 wheat crop, but he sowed 23 acres, intending to use the excess by consuming it on his own farm. Filburn *18 argued that even though we had sustained Congress’ power to regulate the production of goods for commerce, that power did not authorize “federal regulation [of] production not intended in any part for commerce but wholly for consumption on the farm.” Wickard, 317 U. S., at 118. Justice Jackson’s opinion for a unanimous Court rejected this submission. He wrote:
“The effect of the statute before us is to restrict the amount which may be produced for market and the extent as well to which one may forestall resort to the market by producing to meet his own needs. That ap-pellee’s own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.” Id., at 127-128.
Wickard thus establishes that Congress can regulate purely intrastate activity that is not itself “commercial,” in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity.
The similarities between this case and Wickard are striking. Like the farmer in Wickard, respondents are cultivating, for home consumption, a fungible commodity for which there is an established, albeit illegal, interstate market.[28] Just as the Agricultural Adjustment Act was designed “to *19 control the volume [of wheat] moving in interstate and foreign commerce in order to avoid surpluses ...” and consequently control the market price, id., at 115, a primary purpose of the CSA is to control the supply and demand of controlled substances in both lawful and unlawful drug markets. See nn. 20-21, supra. In Wickard, we had no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions. Here too, Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions.
More concretely, one concern prompting inclusion of wheat grown for home consumption in the 1938 Act was that rising market prices could draw such wheat into the interstate market, resulting in lower market prices. Wickard, 317 U. S., at 128. The parallel concern making it appropriate to include marijuana grown for home consumption in the CSA is the likelihood that the high demand in the interstate market will draw such marijuana into that market. While the diversion of homegrown wheat tended to frustrate the federal interest in stabilizing prices by regulating the volume of commercial transactions in the interstate market, the diversion of homegrown marijuana tends to frustrate the federal interest in eliminating commercial transactions in the interstate market in their entirety. In both cases, the regulation is squarely within Congress’ commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity.[29]
*20 Nonetheless, respondents suggest that Wickard differs from this case in three respects: (1) the Agricultural Adjustment Act, unlike the CSA, exempted small farming operations; (2) Wickard involved a “quintessential economic activity” — a commercial farm — whereas respondents do not sell marijuana; and (3) the Wickard record made it clear that the aggregate production of wheat for use on farms had a significant impact on market prices. Those differences, though factually accurate, do not diminish the precedential force of this Court’s reasoning.
The fact that Filburn’s own impact on the market was “trivial by itself” was not a sufficient reason for removing him from the scope of federal regulation. 317 U. S., at 127. That the Secretary of Agriculture elected to exempt even smaller farms from regulation does not speak to his power to regulate all those whose aggregated production was significant, nor did that fact play any role in the Court’s analysis. Moreover, even though Filburn was indeed a commercial farmer, the activity he was engaged in — the cultivation of wheat for home consumption — was not treated by the Court as part of his commercial farming operation.[30] And while it is true that the record in the Wickard case itself established the causal connection between the production for local use and the national market, we have before us findings by Congress to the same effect.
Findings in the introductory sections of the CSA explain why Congress deemed it appropriate to encompass local activities within the scope of the CSA. See n. 20, supra. The *21 submissions of the parties and the numerous amici all seem to agree that the national, and international, market for marijuana has dimensions that are fully comparable to those defining the class of activities regulated by the Secretary pursuant to the 1938 statute.[31] Respondents nonetheless insist that the CSA cannot be constitutionally applied to their activities because Congress did not make a specific finding that the intrastate cultivation and possession of marijuana for medical purposes based on the recommendation of a physician would substantially affect the larger interstate marijuana market. Be that as it may, we have never required Congress to make particularized findings in order to legislate, see Lopez, 514 U. S., at 562; Perez, 402 U. S., at 156, absént a special concern such as the protection of free speech, see, e. g., Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622, 664-668 (1994) (plurality opinion). While congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, particularly when the connection to commerce is not self-evident, and while we will consider congressional findings in our analysis when they are available, the absence of particularized findings does not call into question Congress’ authority to legislate.[32]
*22 In assessing the scope of Congress’ authority under the Commerce Clause, we stress that the task before us is a modest one. We need not determine whether respondents’ activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a “rational basis” exists for so concluding. Lopez, 514 U. S., at 557; see also Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U. S. 264, 276-280 (1981); Perez, 402 U. S., at 155-156; Katzenbach v. McClung, 379 U. S. 294, 299-301 (1964); Heart of Atlanta Motel, Inc. v. United States, 379 U. S. 241, 252-253 (1964). Given the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, 21 U. S. C. §801(5), and concerns about diversion into illicit channels,[33] we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA. Thus, as in Wickard, when it enacted comprehensive legislation to regulate the interstate market in a fungible commodity, Congress was acting well within its authority to “make all Laws which shall be necessary and proper” to “regulate Commerce . . . among the several States.” U. S. Const., Art. I, § 8. That the regulation ensnares some purely intrastate activity is of no moment. As we have done many times before, we refuse to excise individual components of that larger scheme.
*23 IV
To support their contrary submission, respondents rely heavily on two of our more recent Commerce Clause cases. In their myopic focus, they overlook the larger context of modern-era Commerce Clause jurisprudence preserved by those cases. Moreover, even in the narrow prism of respondents’ creation, they read those cases far too broadly.
Those two cases, of course, are Lopez, 514 U. S. 549, and Morrison, 529 U. S. 598. As an initial matter, the statutory challenges at issue in those cases were markedly different from the challenge respondents pursue in the case at hand. Here, respondents ask us to excise individual applications of a concededly valid statutory scheme. In contrast, in both Lopez and Morrison, the parties asserted that a particular statute or provision fell outside Congress’ commerce power in its entirety. This distinction is pivotal for we have often reiterated that “[wjhere the class of activities is regulated and that class is within the reach of federal power, the courts have no power ‘to excise, as trivial, individual instances’ of the class.” Perez, 402 U. S., at 154 (quoting Wirtz, 392 U. S., at 193 (emphasis deleted)); see also Hodel, 452 U. S., at 308.
At issue in Lopez, 514 U. S. 549, was the validity of the Gun-Free School Zones Act of 1990, which was a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone. 104 Stat. 4844-4845, 18 U. S. C. § 922(q)(1)(A). The Act did not regulate any economic activity and did not contain any requirement that the possession of a gun have any connection to past interstate activity or a predictable impact on future commercial activity. Distinguishing our earlier cases holding that comprehensive regulatory statutes may be validly applied to local conduct that does not, when viewed in isolation, have a significant impact on interstate commerce, we held the statute invalid. We explained:
*24 “Section 922(q) is a criminal statute that by its terms has nothing to do with ‘commerce’ or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.” 514 U. S., at 561.
The statutory scheme that the Government is defending in this litigation is at the opposite end of the regulatory spectrum. As explained above, the CSA, enacted in 1970 as part of the Comprehensive Drug Abuse Prevention and Control Act, 84 Stat. 1242-1284, was a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of “controlled substances.” Most of those substances — those listed in Schedules II through V — “have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.” 21 U. S. C. §801(1). The regulatory scheme is designed to foster the beneficial use of those medications, to prevent their misuse, and to prohibit entirely the possession or use of substances listed in Schedule I, except as a part of a strictly controlled research project.
While the statute provided for the periodic updating of the five schedules, Congress itself made the initial classifications. It identified 42 opiates, 22 opium derivatives, and 17 hallucinogenic substances as Schedule I drugs. 84 Stat. 1248. Marijuana was listed as the 10th item in the 3d subcategory. That classification, unlike the discrete prohibition established by the Gun-Free School Zones Act of 1990, was merely one of many “essential part[s] of a larger regulation of economic activity, in which the regulatory scheme could be undercut *25 unless the intrastate activity were regulated.” Lopez, 514 U. S., at 561.[34] Our opinion in Lopez casts no doubt on the validity of such a program.
Nor does this Court’s holding in Morrison, 529 U. S. 598. The Violence Against Women Act of 1994, 108 Stat. 1902, created a federal civil remedy for the victims of gender-motivated crimes of violence. 42 U. S. C. § 18981. The remedy was enforceable in both state and federal courts, and generally depended on proof of the violation of a state law. Despite congressional findings that such crimes had an adverse impact on interstate commerce, we held the statute unconstitutional because, like the statute in Lopez, it did not regulate economic activity. We concluded that “the noneco-nomic, criminal nature of the conduct at issue was central to our decision” in Lopez, and that our prior cases had identified a clear pattern of analysis: “‘Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.’”[35] Morrison, 529 U. S., at 610.
Unlike those at issue in Lopez and Morrison, the activities regulated by the CSA are quintessentially economic. “Economics” refers to “the production, distribution, and consumption of commodities.” Webster’s Third New International *26 Dictionary 720 (1966). The CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market. Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product.[36] Such prohibitions include specific decisions requiring that a drug be withdrawn from the market as a result of the failure to comply with regulatory requirements as well as decisions excluding Schedule I drugs entirely from the market. Because the CSA is a statute that directly regulates economic, commercial activity, our opinion in Morrison casts no doubt on its constitutionality.
The Court of Appeals was able to conclude otherwise only by isolating a “separate and distinct” class of activities that it held to be beyond the reach of federal power, defined as “the intrastate, noncommercial cultivation, possession and use of marijuana for personal medical purposes on the advice of a physician and in accordance with state law.” 352 F. 3d, at 1229. The court characterized this class as “different in kind from drug trafficking.” Id., at 1228. The differences between the members of a class so defined and the principal traffickers in Schedule I substances might be sufficient to justify a policy decision exempting the narrower class from the coverage of the CSA. The question, however, is whether Congress’ contrary policy judgment, i. e., its decision to include this narrower “class of activities” within the larger regulatory scheme, was constitutionally deficient. We have no difficulty concluding that Congress acted rationally in determining that none of the characteristics making up the purported class, whether viewed individually or in the aggregate, compelled an exemption from the CSA; rather, the subdivided class of activities defined by the Court *27 of Appeals was an essential part of the larger regulatory scheme.
First, the fact that marijuana is used “for personal medical purposes on the advice of a physician” cannot itself serve as a distinguishing factor. Id., at 1229. The CSA designates marijuana as contraband for any purpose; in fact, by characterizing marijuana as a Schedule I drug, Congress expressly found that the drug has no acceptable medical uses. Moreover, the CSA is a comprehensive regulatory regime specifically designed to regulate which controlled substances can be utilized for medicinal purposes, and in what manner. Indeed, most of the substances classified in the CSA “have a useful and legitimate medical purpose.” 21 U. S. C. §801(1). Thus, even if respondents are correct that marijuana does have accepted medical uses and thus should be redesignated as a lesser schedule drug,[37] the CSA would still impose controls beyond what is required by California law. The CSA requires manufacturers, physicians, pharmacies, and other handlers of controlled substances to comply with statutory and regulatory provisions mandating registration with the DEA, compliance with specific production quotas, security controls to guard against diversion, recordkeeping and reporting obligations, and prescription requirements. See *28 §§ 821-830; 21 CFR § 1301 et seq. (2004). Furthermore, the dispensing of new drugs, even when doctors approve their use, must await federal approval. United States v. Rutherford, 442 U. S. 544 (1979). Accordingly, the mere fact that marijuana — like virtually every other controlled substance regulated by the CSA — is used for medicinal purposes cannot possibly serve to distinguish it from the core activities regulated by the CSA.
Nor can it serve as an “objective marke[r]” or “objective facto[r]” to arbitrarily narrow the relevant class as the dissenters suggest, post, at 47 (opinion of O’Connor, J.); post, at 68 (opinion of Thomas, J.). More fundamentally, if, as the principal dissent contends, the personal cultivation, possession, and use of marijuana for medicinal purposes is beyond the “ ‘outer limits’ of Congress’ Commerce Clause authority,” post, at 42 (opinion of O’Connor, J.), it must also be true that such personal use of marijuana (or any other homegrown drug) for recreational purposes is also beyond those “ ‘outer limits,’ ” whether or not a State elects to authorize or even regulate such use. Justice Thomas’ separate dissent suffers from the same sweeping implications. That is, the dissenters’ rationale logically extends to place any federal regulation (including quality, prescription, or quantity controls) of any locally cultivated and possessed controlled substance for any purpose beyond the “‘outer limits’” of Congress’ Commerce Clause authority. One need not have a degree in economics to understand why a nationwide exemption for the vast quantity of marijuana (or other drugs) locally cultivated for personal use (which presumably would include use by friends, neighbors, and family members) may have a substantial impact on the interstate market for this extraordinarily popular substance. The congressional judgment that an exemption for such a significant segment of the total market would undermine the orderly enforcement of the entire regulatory scheme is entitled to a strong presumption of validity. Indeed, that judgment is not only rational, but “visible to the *29 naked eye,” Lopez, 514 U. S., at 563, under any commonsense appraisal of the probable consequences of such an open-ended exemption.
Second, limiting the activity to marijuana possession and cultivation “in accordance with state law” cannot serve to place respondents’ activities beyond congressional reach. The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail. It is beyond peradventure that federal power over commerce is “ ‘superior to that of the States to provide for the welfare or necessities of their inhabitants,”’ however legitimate or dire those necessities may be. Wirtz, 392 U. S., at 196 (quoting Sanitary Dist. of Chicago v. United States, 266 U. S. 405, 426 (1925)). See also 392 U. S., at 195-196; Wickard, 317 U. S., at 124 (“ ‘[N]o form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress’ ”). Just as state acquiescence to federal regulation cannot expand the bounds of the Commerce Clause, see, e. g., Morrison, 529 U. S., at 661-662 (Breyer, J., dissenting) (noting that 38 States requested federal intervention), so too state action cannot circumscribe Congress’ plenary commerce power. See United States v. Darby, 312 U. S. 100, 114 (1941) (“That power can neither be enlarged nor diminished by the exercise or non-exercise of state power”).[38]
*30 Respondents acknowledge this proposition, but nonetheless contend that their activities were not “an essential part of a larger regulatory scheme” because they had been “isolated by the State of California, and [are] policed by the State of California,” and thus remain “entirely separated from the market.” Tr. of Oral Arg. 27. The dissenters fall prey to similar reasoning. See n. 38, supra, at 26 and this page. The notion that California law h#s surgically excised a discrete activity that is hermetically sealed off from the larger interstate marijuana market is a dubious proposition, and, more importantly, one that Congress could have rationally rejected.
Indeed, that the California exemptions will have a significant impact on both the supply and demand sides of the market for marijuana is not just “plausible” as the principal dissent concedes, post, at 56 (opinion of O’Connor, J.), it is readily apparent. The exemption for physicians provides them with an economic incentive to grant their patients permission to use the drug. In contrast to most prescriptions for legal drugs, which limit the dosage and duration of the usage, under California law the doctor’s permission to *31 recommend marijuana use is open-ended. The authority to grant permission whenever the doctor determines that a patient is afflicted with “any other illness for which marijuana provides relief,” Cal. Health & Safety Code Ann. § 11362.5(b)(1)(A) (West Supp. 2005), is broad enough to allow even the most scrupulous doctor to conclude that some recreational uses would be therapeutic.[39] And our cases have taught us that there are some unscrupulous physicians who overprescribe when it is sufficiently profitable to do so.[40]
The exemption for cultivation by patients and caregivers can only increase the supply of marijuana in the California market.[41] The likelihood that all such production will *32 promptly terminate when patients recover or will precisely match the patients’ medical needs during their convalescence seems remote; whereas the danger that excesses will satisfy some of the admittedly enormous demand for recreational use seems obvious.[42] Moreover, that the national and international narcotics trade has thrived in the face of vigorous criminal enforcement efforts suggests that no small number of unscrupulous people will make use of the California exemptions to serve their commercial ends whenever it is feasible to do so.[43] Taking into account the fact that California is only one of at least nine States to have authorized the medical use of marijuana, a fact Justice O’Connor’s dissent conveniently disregards in arguing that the demonstrated effect on commerce while admittedly “plausible” is ultimately “unsubstantiated,” post, at 56, 55, Congress could have rationally concluded that the aggregate impact on the national market of all the transactions exempted from federal supervision is unquestionably substantial.
So, from the “separate and distinct” class of activities identified by the Court of Appeals (and adopted by the dissenters), we are left with “the intrastate, noncommercial cultivation, possession and use of marijuana.” 352 F. 3d, at 1229. Thus the case for the exemption comes down to the claim that a locally cultivated product that is used domestically *33 rather than sold on the open market is not subject to federal regulation. Given the findings in the CSA and the undisputed magnitude of the commercial market for marijuana, our decisions in Wickard, v. Filburn and the later cases endorsing its reasoning foreclose that claim.
V
Respondents also raise a substantive due process claim and seek to avail themselves of the medical necessity defense. These theories of relief were set forth in their complaint but were not reached by the Court of Appeals. We therefore do not address the question whether judicial relief is available to respondents on these alternative bases. We do note, however, the presence of another avenue of relief. As the Solicitor General confirmed during oral argument, the statute authorizes procedures for the reclassification of Schedule I drugs. But perhaps even more important than these legal avenues is the democratic process, in which the voices of voters allied with these respondents may one day be heard in the halls of Congress. Under the present state of the law, however, the judgment of the Court of Appeals must be vacated. The case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 See Alaska Stat. §§ 11.71.090, 17.37.010-17.37.080 (Lexis 2004); Colo. Const., Art. XVIII, §14, Colo. Rev. Stat. § 18-18-406.3 (Lexis 2004); Haw. Rev. Stat. §§ 329-121 to 329-128 (2004 Cum. Supp.); Me. Rev. Stat. Ann., Tit. 22, § 2383-B(5) (West 2004); Nev. Const., Art. 4, § 38, Nev. Rev. Stat. §§ 453A.010-453A.810 (2003); Ore. Rev. Stat. §§ 475.300-475.346 (2003); Vt. Stat. Ann., Tit. 18, §§ 4472-4474d (Supp. 2004); Wash. Rev. Code §§ 69.51.010-69.51.080 (2004); see also Ariz. Rev. Stat. Ann. §13-3412.01 (West Supp. 2004) (voter initiative permitting physicians to prescribe Schedule I substances for medical purposes that was purportedly repealed in 1997, but the repeal was rejected by voters in 1998). In November 2004, Montana voters approved Initiative 148, adding to the number of States authorizing the use of marijuana for medical purposes.

 1913 Cal. Stats. ch. 342, § 8a; see also Gieringer, The Origins of Cannabis Prohibition in California 21-23 (rev. Mar. 2005), available at http:// www.canorml.org/background/caloriginsmjproh.pdf (all Internet materials as visited June 2, 2005, and available in Clerk of Court’s case file).

 Cal. Health & Safety Code Ann. § 11362.5 (West Supp. 2005). The California Legislature recently enacted additional legislation supplementing the Compassionate Use Act. §§ 11362.7-11362.9.

 “The people of the State of California hereby find and declare that the purposes of the Compassionate Use Act of 1996 are as follows:
“(A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person’s health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.
“(B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction.
“(C) To encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana.” § 11362.5(b)(1).

 “Notwithstanding any other provision of law, no physician in this state shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes.” § 11362.5(c).

 “Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient’s primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician.” § 11362.5(d).

 111362.5(e).

 On remand, the District Court entered a preliminary injunction enjoining petitioners “ ‘from arresting or prosecuting Plaintiffs Angel McClary Raich and Diane Monson, seizing their medical cannabis, forfeiting their property, or seeking civil or administrative sanctions against them with respect to the intrastate, non-commercial cultivation, possession, use, and obtaining without charge of cannabis for personal medical purposes on the advice of a physician and in accordance with state law, and which is not used for distribution, sale, or exchange.’ ” Brief for Petitioners 9.

 See D. Musto & P. Korsmeyer, The Quest for Drug Control 60 (2002) (hereinafter Musto & Korsmeyer).

 H. R. Rep. No. 91-1444, pt. 2, p. 22 (1970) (hereinafter H. R. Rep.); 26 Congressional Quarterly Almanac 531 (1970) (hereinafter Almanac); Musto & Korsmeyer 56-57.

 Pure Food and Drugs Act of 1906, ch. 3915, 34 Stat. 768, repealed by Act of June 25,1938, ch. 675, § 902(a), 52 Stat. 1059.

 See United States v. Doremus, 249 U. S. 86 (1919); Leary v. United States, 395 U. S. 6, 14-16 (1969).

 See Doremus, 249 U. S., at 90-93.

 R. Bonnie & C. Whitebread, The Marijuana Conviction 154-174 (1999); L. Grinspoon & J. Bakalar, Marihuana, the Forbidden Medicine 7-8 (rev. ed. 1997) (hereinafter Grinspoon & Bakalar). Although this was the Federal Government's first attempt to regulate the marijuana trade, by this time all States had in place some form of legislation regulating the sale, use, or possession of marijuana. R. Isralowitz, Drug Use, Policy, and Management 134 (2d ed. 2002).

 Leary, 395 U. S., at 14-16.

 Grinspoon & Bakalar 8.

 Leary, 395 U. S., at 16-18.

 Musto & Korsmeyer 32-35; 26 Almanac 533. In 1973, the Bureau of Narcotics and Dangerous Drugs became the DEA. See Reorg. Plan No. 2 of 1973, §1,28 CFR §0.100 (1973).

 The Comprehensive Drug Abuse Prevention and Control Act of 1970 consists of three titles. Title I relates to the prevention and treatment of narcotic addicts through HEW (now the Department of Health and Human Services). 84 Stat. 1238. Title II, as discussed in more detail above, addresses drug control and enforcement as administered by the Attorney General and the DEA. Id., at 1242. Title III concerns the import and export of controlled substances. Id., at 1285.

 In particular, Congress made the following findings:
“(1) Many of the drugs included within this subchapter have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.
*13 “(2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.
“(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because—
“(A) after manufacture, many controlled substances are transported in interstate commerce,
“(B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and
“(C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.
“(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.
“(5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.
“(6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.” 21 U. S. C. §§801(1M6).

 See United States v. Moore, 423 U.S. 122, 135 (1975); see also H. R. Rep., at 22.

 Id., at 61 (quoting letter from Roger O. Egeberg, M. D., to Hon. Harley O. Staggers (Aug. 14,1970)).

 Starting in 1972, the National Organization for the Reform of Marijuana Laws began its campaign to reclassify marijuana. Grinspoon & Bakalar 13-17. After some fleeting success in 1988 when an Administrative Law Judge (ALJ) declared that the DEA would be acting in an “unreasonable, arbitrary, and capricious” manner if it continued to deny marijuana access to seriously ill patients, and concluded that it should be reclassified as a Schedule III substance, Grinspoon v. DEA, 828 F. 2d 881, 883-884 (CA1 1987), the campaign has proved unsuccessful. The DEA Administrator did not endorse the AU’s findings, 54 Fed. Reg. 53767 (1989), and since that time has routinely denied petitions to reschedule the drug, most recently in 2001. 66 Fed. Reg. 20038 (2001). The Court of Appeals for the District of Columbia Circuit has reviewed the petition to reschedule marijuana on five separate occasions over the course of 30 years, ultimately upholding the Administrator’s final order. See Alliance for Cannabis Therapeutics v. DEA, 15 F. 3d 1131, 1133 (1994).

 United States v. Lopez, 514 U. S. 549, 552-558 (1995); id., at 568-574 (Kennedy, J., concurring); id., at 604-607 (Souter, J., dissenting).

 See Gibbons v. Ogden, 9 Wheat. 1, 224 (1824) (opinion of Johnson, J.); Stern, That Commerce Which Concerns More States Than One, 47 Harv. L. Rev. 1335, 1337, 1340-1341 (1934); G. Gunther, Constitutional Law 127 (9th ed. 1975).

 See Lopez, 514 U. S., at 553-554; id., at 568-569 (Kennedy, J., concurring); see also Granholm v. Heald, 544 U. S. 460, 472-473 (2005).

 Lopez, 514 U. S., at 554; see also Wickard v. Filburn, 317 U. S. 111, 121 (1942) (“It was not until 1887, with the enactment of the Interstate Commerce Act, that the interstate commerce power began to exert positive influence in American law and life. This first important federal resort to the commerce power was followed in 1890 by the Sherman AntiTrust Act and, thereafter, mainly after 1903, by many others. These statutes ushered in new phases of adjudication, which required the Court to approach the interpretation of the Commerce Clause in the light of an actual exercise by Congress of its power thereunder” (footnotes omitted)).

 Even respondents acknowledge the existence of an illicit market in marijuana; indeed, Raich has personally participated in that market, and Monson expresses a willingness to do so in the future. App. 59, 74, 87. See also Department of Revenue of Mont. v. Kurth Ranch, 511 U. S. 767, 770, 774, n. 12, and 780, n. 17 (1994) (discussing the “market value” of marijuana); id., at 790 (Rehnquist, C. J., dissenting); id., at 792 (O’Connor, J., dissenting); Whalen v. Roe, 429 U. S. 589, 591 (1977) (addressing prescription drugs “for which there is both a lawful and an unlawful market”); Turner v. United States, 396 U. S. 398, 417, n. 33 (1970) (referring to the purchase of drugs on the “retail market”).

 To be sure, the wheat market is a lawful market that Congress sought to protect and stabilize, whereas the marijuana market is an unlawful market that Congress sought to eradicate. This difference, however, is of no constitutional import. It has long been settled that Congress’ power to regulate commerce includes the power to prohibit commerce in a particu *20 lar commodity. Lopez, 514 U. S., at 571 (Kennedy, J., concurring) (“In the Lottery Case, 188 U. S. 321 (1903), the Court rejected the argument that Congress lacked [the] power to prohibit the interstate movement of lottery tickets because it had power only to regulate, not to prohibit”); see also Wickard, 317 U. S., at 128 (“The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon”).

 See id., at 125 (recognizing that Filbum’s activity “may not be regarded as commerce”).

 The Executive Office of the President has estimated that in 2000 American users spent $10.5 billion on the purchase of marijuana. Office of Nat. Drug Control Policy, Marijuana Fact Sheet 5 (Feb. 2004), http:// www.whitehousedrugpolicy.gov/publications/factsht/marijuana/index.html.

 Moreover, as discussed in more detail above, Congress did make findings regarding the effects of intrastate drug activity on interstate commerce. See n. 20, supra. Indeed, even the Court of Appeals found that those findings “weighted] in favor” of upholding the constitutionality of the CSA. 352 F. 3d 1222, 1232 (CA9 2003) (case below). The dissenters, however, would impose a new and heightened burden on Congress (unless the litigants can garner evidence sufficient to cure Congress’ perceived “inadequa[cies]”) — that legislation must contain detailed findings proving that each activity regulated within a comprehensive statute is essential to the statutory scheme. Post, at 53-55 (opinion of O’Connor, J.); post, at 64 (opinion of Thomas, J.). Such an exacting requirement is not only un *22 precedented, it is also impractical. Indeed, the principal dissent’s critique of Congress for “not even” including “declarations” specific to marijuana is particularly unpersuasive given that the CSA initially identified 80 other substances subject to regulation as Schedule I drugs, not to mention those categorized in Schedules II-V. Post, at 55 (opinion of O’Connor, J.). Surely, Congress cannot be expected (and certainly should not be required) to include specific findings on each and every substance contained therein in order to satisfy the dissenters’ unfounded skepticism.

 See n. 21, supra (citing sources that evince Congress’ particular concern with the diversion of drugs from legitimate to illicit channels).

 The principal dissent asserts that by “[s]eizing upon our language in Lopez,” post, at 46 (opinion of O’Connor, J.), i. e., giving effect to our well-established case law, Congress will now have an incentive to legislate broadly. Even putting aside the political checks that would generally curb Congress’ power to enact a broad and comprehensive scheme for the purpose of targeting purely local activity, there is no suggestion that the CSA constitutes the type of “evasive” legislation the dissent fears, nor could such an argument plausibly be made. Post, at 47 (O’Connor, J., dissenting).

 Lopez, 514 U. S., at 560; see also id., at 573-574 (Kennedy, J., concurring) (stating that Lopez did not alter our “practical conception of commercial regulation” and that Congress may “regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy”).

 See 16 U. S. C. § 668(a) (bald and golden eagles); 18 U. S. C. § 175(a) (biological weapons); § 831(a) (nuclear material); §842(n)(l) (certain plastic explosives); § 2342(a) (contraband cigarettes).

 We acknowledge that evidence proffered by respondents in this case regarding the effective medical uses for marijuana, if found credible after trial, would cast serious doubt on the accuracy of the findings that require marijuana to be listed in Schedule I. See, e. g., Institute of Medicine, Marijuana and Medicine: Assessing the Science Base 179 (J. Joy, S. Watson, & J. Benson eds. 1999) (recognizing that “[s]cientific data indicate the potential therapeutic value of eannabinoid drugs, primarily THC [Tetrahydrocan-nabinol] for pain relief, control of nausea and vomiting, and appetite stimulation”); see also Conant v. Walters, 309 F. 3d 629, 640-643 (CA9 2002) (Kozinski, J., concurring) (chronicling medical studies recognizing valid medical uses for marijuana and its derivatives). But the possibility that the drug may be reclassified in the future has no relevance to the question whether Congress now has the power to regulate its production and distribution. Kespondents’ submission, if accepted, would place all homegrown medical substances beyond the reach of Congress’ regulatory jurisdiction.

 That is so even if California’s current controls (enacted eight years after the Compassionate Use Act was passed) are “effective,” as the dissenters would have us blindly presume, post, at 53-54 (opinion of O’Con-nor, J.); post, at 63,68 (opinion of Thomas, J.). California’s decision (made 34 years after the CSA was enacted) to impose “stric[t] controls” on the “cultivation and possession of marijuana for medical purposes,” post, at 62 (Thomas, J., dissenting), cannot retroactively divest Congress of its authority under the Commerce Clause. Indeed, Justice Thomas’ urgings to the contrary would turn the Supremacy Clause on its head, and would resurrect limits on congressional power that have long since been rejected. See post, at 41 (Scalia, J., concurring in judgment) (quoting McCulloch v. Maryland, 4 Wheat. 316, 424 (1819)) (“ ‘To impose on [Congress] *30 the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution’ ”).
Moreover, in addition to casting aside more than a century of this Court’s Commerce Clause jurisprudence, it is noteworthy that Justice Thomas’ suggestion that States possess the power to dictate the extent of Congress’ commerce power would have far-reaching implications beyond the facts of this case. For example, under his reasoning, Congress would be equally powerless to regulate, let alone prohibit, the intrastate possession, cultivation, and use of marijuana for recreational purposes, an activity which all States “strictly contro[l].” Indeed, his rationale seemingly would require Congress to cede its constitutional power to regulate commerce whenever a State opts to exercise its “traditional police powers to define the criminal law and to protect the health, safety, and welfare of their citizens.” Post, at 66 (dissenting opinion).

 California’s Compassionate Use Act has since been amended, limiting the catchall category to “[a]ny other chronic or persistent medical symptom that either:... [substantially limits the ability of the person to conduct one or more major life activities as defined” in the Americans with Disabilities Act of 1990, or “[i]f not alleviated, may cause serious harm to the patient’s safety or physical or mental health.” Cal. Health & Safety Code Ann. §§ 11362.7(h)(12)(AMB) (West Supp. 2005).

 See, e. g., United States v. Moore, 423 U. S. 122 (1975); United States v. Doremus, 249 U. S. 86 (1919).

 The state policy allows patients to possess up to eight ounces of dried marijuana, and to cultivate up to 6 mature or 12 immature plants. Cal. Health & Safety Code Ann. § 11362.77(a) (West Supp. 2005). However, the quantity limitations serve only as a floor. Based on a doctor’s recommendation, a patient can possess whatever quantity is necessary to satisfy his medical needs, and cities and counties are given carte blanche to establish more generous limits. Indeed, several cities and counties have done just that. For example, patients residing in the cities of Oakland and Santa Cruz and in the counties of Sonoma and Tehama are permitted to possess up to 3 pounds of processed marijuana. Reply Brief for Petitioners 18-19 (citing Proposition 215 Enforcement Guidelines). Putting that quantity in perspective, 3 pounds of marijuana yields roughly 3,000 joints or cigarettes. Executive Office of the President, Office of National Drug Control Policy, What America’s Users Spend on Illegal Drugs 24 (Dec. 2001), http://www.whitehousedrugpolicy.gov/publications/pdf/american_ users_spend_2002.pdf. And the street price for that amount can range anywhere from $900 to $24,000. DEA, Illegal Drug Price and Purity Report (Apr. 2003) (DEA-02058).

 For example, respondent Raich attests that she uses 2.5 ounces of cannabis a week. App. 82. Yet as a resident of Oakland, she is entitled to possess up to 3 pounds of processed marijuana at any given time, nearly 20 times more than she uses on a weekly basis.

 See, e. g., People ex rel. Lungren v. Peron, 59 Cal. App. 4th 1383, 1386-1387, 70 Cal. Rptr. 2d 20, 23 (1997) (recounting how a Cannabis Buyers’ Club engaged in an “indiscriminate and uncontrolled pattern of sale to thousands of persons among the general public, including persons who had not demonstrated any recommendation or approval of a physician and, in fact, some of whom were not under the care of a physician, such as undercover officers,” and noting that “some persons who had purchased marijuana on respondents’ premises were reselling it unlawfully on the street”).

 In fact, the Anti-Federalists objected that the Necessary and Proper Clause would allow Congress, inter alia, to “constitute new Crimes, . . . and extend [its] Power as far as [it] shall think proper; so that the State Legislatures have no Security for the Powers now presumed to remain to them; or the People for their Rights.” Mason, Objections to the Constitution Formed by the Convention (1787), in 2 The Complete Anti-Federalist 11, 12-13 (H. Storing ed. 1981) (emphasis added). Hamilton responded that these objections were gross “misrepresentation[s].” The Federalist No. 33, at 204. He termed the Clause “perfectly harmless,” for it merely confirmed Congress’ implied authority to enact laws in exercising its enumerated powers. Id., at 205; see also Lopez, 514 U. S., at 597, n. 6 (Thomas, J., concurring) (discussing Congress’ limited ability to establish nationwide criminal prohibitions); Cohens v. Virginia, 6 Wheat. 264, 426-428 (1821) (finding it “clear, that Congress cannot punish felonies generally,” except in areas over which it possesses plenary power). According to Hamilton, the Clause was needed only “to guard against cavilling refinements” by those seeking to cripple federal power. The Federalist No. 33, at 205; id., No. 44, at 303-304 (J. Madison).