GRIFFITH, Circuit Judge,
dissenting.
Experimental drugs present a variety of potential risks and benefits to patients. Some drugs may harm patients; others may help. Acting at the direction of Congress, the Food and Drug Administration (“FDA”) determines and balances those risks and benefits during the testing process for new drugs with input from the scientific and medical communities. Sometimes initial scientific conclusions support providing seriously ill patients early access to experimental drugs or hastening the testing process. Sometimes they do not. The FDA examines the science behind each new drug and makes a judgment about what level of access will provide *487 patients with an effective drug that carries an acceptable level of risk. One group of terminally ill patients believes the FDA is too cautious. The Abigail Alliance for Better Access to Developmental Drugs (the “Alliance”) favors a different balance that would allow terminally ill patients access to all experimental drugs after the first phase of FDA testing is complete. The Alliance argues that the Constitution guarantees them this access.
Courts must, of course, be cautious about acceding to a litigant’s claim of a newly-discovered constitutional right. To succeed here, the Alliance must show that the access to experimental drugs it seeks for terminally ill patients is a “fundamental right[ ] and libert[y] which [is], objectively, ‘deeply rooted in this Nation’s history and tradition,’ ” Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting Moore v. East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion)), and “ ‘implicit in the concept of ordered liberty,’ such that ‘neither liberty nor justice would exist if [it] w[as] sacrificed,’ ” 521 U.S. at 721, 117 S.Ct. 2258 (quoting Palko v. Connecticut, 302 U.S. 319, 325-26, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). Although others previously have argued for the creation of a similar right, until today, no circuit court has assented to such a claim. The majority creates a fundamental right by making a series of inferences prohibited by Glucksberg. From the fact that the Government has not always regulated drugs, the majority infers a constitutional right to be free from such regulation. From the common law defense of necessity and the tradition prohibiting battery and forced medication, the majority infers a fundamental right of access to medication. From the fact that drugs in the first phase of FDA testing have undergone some testing, the majority infers that those drugs will probably have a medical benefit with sufficiently minimal risk. But there is no evidence in this Nation’s history and traditions of a right to access experimental drugs. Balancing the risks and benefits found at the forefront of uncertain science and medicine has been, for good reason, the historical province of the democratic branches. Because I can find no basis in the Constitution or judicial precedents to remove that function from the elected branches, I respectfully dissent.
I.
People of good will wish for scientists to develop effective, safe cures for terminally ill patients as quickly as possible. The Alliance could have taken its argument to Congress and attempted to convince our Nation’s lawmakers that the current balance between safety and risk is scientifically or morally misguided and that terminally ill patients should have the early access to experimental drugs that the Alliance seeks. Congress could have held hearings on the subject and heard the viewpoints of scientists, doctors, patients, advocacy groups (like the Alliance), moralists, ethicists, and citizens. Congress could then exercise its lawmaking function by striking a new balance between early availability and the need for sufficient understanding of the toxicity and potential benefits of experimental drugs. The Alliance could also work with the FDA, as the agency suggested in a letter to the Alliance, to “help expand patient access to promising new treatments [by] working] with sponsors and with [the] FDA to better understand the reasons sponsors choose not to create these [early access] programs [already existing under the FDA’s regulations] and to identify additional incentives for participation.” Just as the Supreme Court reminded litigants who argued last term in Gonzales v. Raich that substantive due process allowed them to use marijuana *488 for medicinal purposes, “perhaps even more important than these legal avenues is the democratic process, in which the voices of voters allied with these respondents may one day be heard in the halls of Congress.” 545 U.S. 1, -, 125 S.Ct. 2195, 2215, 162 L.Ed.2d 1 (2005). Of course, changing the present level of access to experimental drugs through the democratic branches would involve intense and complicated scientific and moral debates about how best to regulate new drugs.
Instead of allowing the elected branches to resolve these debates, the Alliance argues that the Constitution mandates its desired outcome, regardless of the particular balance already struck by Congress and the Executive. In the Alliance’s view, the Due Process Clause of the Constitution guarantees terminally ill patients a fundamental “right of access to drugs that have cleared Phase I trials” because those drugs are “safe enough to be tested in humans” and “simply ha[ve] not yet met FDA’s standards.” Based upon that argument, the majority creates a fundamental right and concludes that, under the Constitution, “a terminally ill, mentally competent adult patient’s informed access to potentially life-saving investigational new drugs determined by the FDA after Phase I trials to be sufficiently safe for expanded human trials warrants protection under the Due Process Clause.” Maj. Op. at 486.
The Alliance’s proposed new constitutional right would exempt terminally ill patients from much of the legislative and regulatory approval process created by Congress and the FDA for new experimental drugs. Section 505(a) of the Food, Drug, and Cosmetic Act (“FDCA”), 21 U.S.C. § 355(a), bars the introduction of new drugs into interstate commerce until the FDA has approved a sponsor’s application. A new drug application must contain “full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use.” Id. § 355(b)(1)(A). Before testing a new drug on humans for safety and effectiveness, a sponsor must submit for the FDA’s approval an investigational new drug application (“IND”), see id. § 355(i)(l); see also 21 C.F.R. pt. 312, containing detailed information establishing that human testing is appropriate, see 21 C.F.R. § 312.23.
Testing a new drug for safety and effectiveness in treating humans generally requires three or sometimes four phases. See id. § 312.21. Phase I involves the initial introduction of a new drug into human subjects. A Phase I study usually consists of twenty to eighty subjects and is “designed to determine the metabolism and pharmacologic actions of the [new] drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness.” Id. § 312.21(a)(1). The majority and I differ in our understanding of the importance of the testing that occurs after Phase I. The majority implies that the FDA is primarily concerned with effectiveness after Phase I and that the right argued for by the Alliance would only override FDA regulation for effectiveness.[1] Contrary to the majori *489 ty’s suggestion, all phases of the FDA’s testing process for new drugs involve testing for safety. In addition to addressing the effectiveness of a new drug, Phase II studies are used “to determine the common short-term side effects and risks associated with the drug.” Id. § 312.21(b). Phase III studies “gather ... additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug.” Id. § 312.21(c). The FDA further requires some drugs to go through Phase IV studies, which “delineate additional information about the drug’s risks, benefits, and optimal use.” Id. § 312.85.
To guide this process, Congress has directed the FDA to establish “[sjcientific advisory panels” to “provid[e] expert scientific advice and recommendations to the Secretary regarding a clinical investigation of a drug or the approval for marketing of a drug.” 21 U.S.C. § 355(n)(l). Quite specifically, Congress has mandated that the FDA include on these panels scientists from a variety of disciplines. See id. § 355(n)(3).[2] Thus, at issue today is whether terminally ill patients have a fundamental right to procure and use an experimental drug before the FDA and the scientific community have evaluated its scientific and medical risks and corresponding benefits as called for in the FDCA and its accompanying regulations.
The FDA has several regulatory programs in place to hasten research of the safety and effectiveness of drugs for terminally or severely ill patients and allow early access where scientifically and medically warranted. For example, under its “Fast Track” program, the agency has “established procedures designed to expedite the development, evaluation, and marketing of new therapies intended to treat persons with life-threatening and severely-debilitating illnesses, especially where no satisfactory alternative therapy exists.” 21 C.F.R. § 312.80. Fast Track allows the FDA to waive its IND application requirement if it is “unnecessary or cannot be achieved,” id. § 312.10, and even allows a waiver request to be made “[i]n an emergency ... by telephone or other rapid communication,” id. The Accelerated Approval program provides a truncated approval process for “certain new drug products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments.” Id. § 314.500. The FDA categorizes some new drugs, including nearly all cancer drugs, as “priority drugs” and seeks to accelerate their availability.
*490 The Alliance contends that Congress and the FDA have not struck the right balance between early access and safety. In its view, these carefully constructed programs, refined over the years by experience, do not sufficiently allow its members access to the experimental drugs they need. Accordingly, the Alliance developed and submitted to the FDA a comprehensive proposal that argued there is a “different risk-benefit tradeoff facing patients who are terminally ill and who have no other treatment options.” Although the Alliance agreed that “[e]xtensive marshalling of evidence regarding drug interactions, dose optimization, and the like” is “appropriate for new drugs to treat patients with other alternatives,” the Alliance suggested that “these steps may well entail a delay that is fatal” for terminal patients. Accordingly, the Alliance contended that terminally ill patients “should have the ability to opt for a new treatment that has met a lower evidentiary hurdle with respect to safety and efficacy.” The Alliance’s proposal suggested, among other things, that the FDA allow early access based upon “the risk of illness, injury, or death from the disease in the absence of the drug.” The FDA should have promulgated a new regulation, the Alliance contended, that would allow sponsors to market experimental drugs, under some circumstances, after the completion of Phase I trials.
Several senior FDA officials reviewed the Alliance’s proposed regulation. The officials concluded that the Alliance “raised several important questions about expanded access that we believe deserve further consideration,” but questioned whether the specific proposal put forward by the Alliance “would have the intended desirable effects for patients.” The officials concluded that the Alliance’s “suggestion points to an area of significant range of opinion within the patient and provider communities about the standards that should be met before a drug is marketed.” Although “some members of the cancer community have suggested that [the] FDA needs to maintain a strong clinical trial system as the basis of the approval of cancer drugs, ... others, like [the Alliance], have criticized [the FDA] for relying too heavily on completing certain trials before approval.” The FDA noted that “[i]n the realm of reviewing medical products to treat serious and life-threatening diseases, there is inevitable tension between early availability of products to patients, especially patients with refractory disease, and the need to obtain sufficient data to provide a reasonable expectation of benefit and lack of excessive harm.”
Having previously exercised its scientific and medical judgment to “strike the appropriate balance between these two competing goals,” the FDA noted its conclusion that “a reasonably precise estimate of response rate” and “enough experience to detect serious adverse effects” are “critical” in determining when experimental drugs should be made available. Most experimental cancer drugs “have potentially lethal toxicity, with potentially large effects on a patient’s remaining quality of life.” Accordingly, in the FDA’s judgment, “it does not serve patients well to make drugs too widely available before there is a reasonable assessment of such risks to guide patient decisions, and experience in managing them.” Accepting the Alliance’s proposal “would upset the appropriate balance that the FDA is seeking to maintain, by giving almost total weight to the goal of early availability and giving little recognition to the importance of marketing drugs with reasonable knowledge for patients and physicians of their likely clinical benefit and their toxicity.” With its proposal rejected by the FDA, the Alliance turned to the courts rather than the *491 Congress and now asks us to create a new constitutional right that will provide the level of access to experimental drugs they seek.
To understand the constitutional dispute in this case, it is critical to understand what this case is not about. Neither the Constitution nor Congress has authorized this Court to determine which of these two litigants has a more scientifically and medically sound view. FDA scientists, physicians, and officials, acting pursuant to express statutory authority, have determined that blanket access to experimental drugs for terminal patients would present unacceptable scientific and medical risks. Contrary to the FDA’s scientific and medical views, the Alliance believes that, at least for terminally ill patients, the benefits of an experimental drug will usually outweigh its risks after the FDA completes Phase I trials. The only issue this case presents is a narrow one: whether the Due Process Clause of the Constitution mandates access to experimental drugs that have cleared Phase I of FDA testing, such that Congress cannot protect terminally ill patients from the risks experimental drugs present unless it uses a means narrowly tailored toward achieving a compelling interest in limiting access.
II.
In Glucksberg, the Supreme Court set forth a two-part test for determining whether an asserted right is fundamental under the Constitution. “[T]he Due Process Clause specially protects those fundamental rights and liberties which are, objectively, ‘deeply rooted in this Nation’s history and tradition ....’” Glucksberg, 521 U.S. at 720-21, 117 S.Ct. 2258 (quoting Moore, 431 U.S. at 503, 97 S.Ct. 1932). A right must also be “ ‘implicit in the concept of ordered liberty,’ such that ‘neither liberty nor justice would exist if [it] w[as] sacrificed.: ” 521 U.S. at 721, 117 S.Ct. 2258 (quoting Palko, 302 U.S. at 325, 58 S.Ct. 149). The majority properly states the Glucksberg test, but makes several critical errors in its application.
The majority structures its analysis around the first Glucksberg inquiry— whether the claimed right is “deeply rooted” — and gives short shrift to the second part — whether it is part of “ordered liberty.” The majority relies upon three common law concepts, none of which is advanced by the Alliance, as evidence of a fundamental, deeply rooted right to procure and use experimental drugs: (1) the common law defense of necessity; (2) an individual’s common law interest in being free from battery; and (3) common law liability for interference with a rescue. The majority does not discuss, however, evidence of a fundamental right to procure and use experimental drugs — because none exists. In the absence of such a tradition, the majority is left to argue for the creation of a fundamental right from a series of inferences. Glucksberg, mindful of the danger in courts minting new rights from an amalgam of interests, prohibits us from creating new substantive due process rights by inference.
Fundamental rights may “not [be] simply deduced from abstract concepts of personal autonomy.” Glucksberg, 521 U.S. at 725, 117 S.Ct. 2258. Instead, to be fundamental, there must be evidence that the “asserted right has any place in our Nation’s traditions.” Id. at 723, 117 S.Ct. 2258 (emphasis added). Quite simply, the majority has provided no evidence of a right, deeply rooted in our Nation’s history and traditions, to procure and use experimental drugs. To the contrary, the majority concedes that new drugs have been regulated since the early part of the last century. See Maj. Op. at 481. But even where other “decision[s] ... may be just *492 as personal and profound as the decision to refuse unwanted medical treatment,” these other decisions are not protected as fundamental rights if they “ha[ve] never enjoyed similar legal protection.” Glucksberg, 521 U.S. at 725, 117 S.Ct. 2258.
Nor is a common law interest alone sufficient to establish a fundamental right under the Constitution. See Glucksberg, 521 U.S. at 725, 117 S.Ct. 2258 (inquiring whether a right is consistent with “this Nation’s history and constitutional traditions”) (emphasis added); Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (looking to “ ‘those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men’ ”) (emphasis added) (quoting Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). I cannot agree that the common law concepts discussed by the majority demonstrate a fundamental right under Glucksberg. At common law, “[a] necessity defense ‘traditionally covered the situation where physical forces beyond the actor’s control rendered illegal conduct the lesser of two evils.’ ” United States v. Oakland Cannabis Buyers’ Cooperative, 532 U.S. 483, 490, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) (quoting United States v. Bailey, 444 U.S. 394, 410, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980)). Putting aside the difference between a common law defense and a constitutional right, I have serious doubt about how a court can know, as a matter of constitutional law, that the lesser of two evils will be achieved by providing all terminally ill patients access to all Phase I experimental drugs, given the risks these drugs present. In any event, the Supreme Court’s guidance in Oakland indicates that the common law doctrine of necessity is not deeply rooted in this Nation’s history and traditions.
In Oakland, a group of patients seeking access to marijuana for medicinal purposes argued that “because necessity was a defense at common law, medical necessity should be read into the Controlled Substances Act.” Id. at 490, 121 S.Ct. 1711. As an initial matter, the Court noted that “it is an open question whether federal courts ever have authority to recognize a necessity defense not provided by statute.” Id. (emphasis added). “Even at common law, the defense of necessity was somewhat controversial. And under our constitutional system, in which federal crimes are defined by statute rather than by common law, it is especially so.” Id. (internal citations omitted). The Court did “not decide, however, whether necessity can ever be a defense when the federal statute does not expressly provide for it,” id. at 491, 121 S.Ct. 1711, because “[ujnder any conception of legal necessity, one principle is clear: The defense cannot succeed when the legislature itself has made a determination of values,” id. (quotation marks omitted). The structure of the FDCA does just that: Congress has prohibited general access to experimental drugs, see 21 U.S.C. § 355(a), and has prescribed in detail how experimental drugs may be studied and used by the scientific and medical communities, see id. § 355(i). Given the Supreme Court’s conclusion that the common law defense of necessity remains controversial and cannot override a value judgment already determined by the legislature, I cannot see how the majority’s proposed right is supported by the common law doctrine of necessity.
The Supreme Court has “required in substantive-due-process cases a careful description of the asserted fundamental liberty interest.” Glucksberg, 521 U.S. at 721, 117 S.Ct. 2258 (quotation marks omitted). The right at issue in this case, and the right that the majority concludes has been carefully described by the Alliance, is *493 a right of terminally ill patients to access potentially life-saving drugs when no alternative treatment is available. See Maj. Op. Part III(A). The Alliance has narrowly described its asserted right. Cf Glucksberg, 521 U.S. at 723, 117 S.Ct. 2258 (carefully-described asserted right was “a right to commit suicide which itself includes a right to assistance in doing so”). The majority never provides evidence, however, that the Alliance’s asserted right is deeply rooted and implicit in ordered liberty. Instead, the majority infers its new right from several broad principles, none of which would meet Glucksberg’s careful description requirement. See Maj. Op. Part III(B), at 479 (the “right of control over one’s body”), id. (the “right to self-defense”), id. (“the right to self-preservation”), 481 n. 12 (“the specific right to act in order to save one’s own life”), 483 n. 24 (the “fundamental right to take action, even risky action, free from government interference, in order to save one’s own life”); Part III(C), at 484 (the right to “be free to decide ... whether to assume any known or unknown risks of taking a medication that might prolong ... life”), 485 n. 26 (the “right of access to life-saving treatment” with “the key [being] the patient’s right to make her own decision free from government interference”).
The majority concludes that these principles are deeply rooted based upon a passage from Blackstone describing an individual’s interest in being free from battery at common law, see William Blackstone, 1 Commentaries *129, *134, and a provision of the Restatement discussing when one person will be liable under the common law for preventing aid from reaching another, see Restatement (First) of Torts § 326 (1934). The majority infers from these principles a liberty interest in procuring and using experimental drugs. But Glucksberg does not authorize courts to create substantive due process rights by inference. These principles are precisely the type of “abstract concepts of personal autonomy” that do not constitute evidence of a fundamental right. Glucksberg, 521 U.S. at 725, 117 S.Ct. 2258. They are indeterminate concepts that cannot meet Glucksberg’s careful description requirement. The majority has provided no evidence that the Alliance’s “asserted, right has any place in our Nation’s traditions.” Glucksberg, 521 U.S. at 723, 117 S.Ct. 2258 (emphasis added). Simply put, under Glucksberg, the Alliance’s asserted right fails because it is not deeply rooted and implicit in ordered liberty, and the various principles described by the majority fail because they are not carefully described.[3]
The remainder of the majority’s analysis sets out to prove an unremarkable proposition: the federal government has only regulated drugs for approximately 100 years. From the lack of federal regulation prior to 1906, the majority infers a constitutional right to be free from regulation. It is not difficult to see the sweeping claims of fundamental rights that such an analysis would support. Because Congress did not significantly regulate marijuana until relatively late in the constitutional day (ie., 1937), see Gonzales v. Raich, 545 U.S. 1, -, 125 S.Ct. 2195, 2202, 162 L.Ed.2d 1 (2005), there must be a tradition of protecting marijuana use. Because Congress *494 did not regulate narcotics until 1866 when it heavily taxed opium, a drug created long before our Nation’s founding, see United States v. Moore, 486 F.2d 1139, 1215-16, 1218 n. 50 (D.C.Cir.1973) (Wright, J., dissenting), it must be that individuals have a right to acquire and use narcotics free from regulation. But this is not the law. A prior lack of regulation suggests that we must exercise care in evaluating the untested assertion of a constitutional right to be free from new regulation. Indeed, in considering an asserted fundamental right, Glucksberg directs us to “ ‘exercise the utmost care whenever we are asked to break new ground in this field.’ ” 521 U.S. at 720, 117 S.Ct. 2258 (quoting Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). But the fact that the Government has not always regulated a concern tells us little about whether an individual has a constitutional right to pursue that concern. See United States v. Morton Salt Co., 338 U.S. 632, 647, 70 S.Ct. 357, 94 L.Ed. 401 (1950) (“The fact that powers long have been unexercised well may call for close scrutiny as to whether they exist; but if granted, they are not lost by being allowed to lie dormant, any more than nonexistent powers can be prescripted by an unchallenged exercise.”).
The majority devotes a great deal of analysis to the history of the FDCA, setting out to show that, “[i]n contrast to these ancient principles” evidenced in Blackstone and the Restatement, “regulation of access to new drugs has a history in this country that is of recent origin.” Maj. Op. at 481. But the majority concedes in a footnote that it only analyzes the history of the FDCA to “establish that the Government has [not] acquired title to this right by adverse possession.” Id. at 499 n. 24. Thus, the majority appears to agree that the history of the FDCA provides no evidence, under Glucksberg, that would help the Alliance meet its burden. That is, the history of the FDCA does not demonstrate a tradition protecting an individual’s right to procure and use experimental drugs; it only establishes that the federal government has not always regulated experimental drugs.
The majority also fails to recognize that drug regulation did not begin with the FDCA. In England, “when the Society of Apothecaries [ie., pharmacists] was chartered independently ([in] 1617), its master and wardens were empowered to inspect any pharmacy and to burn before the offender’s door all drugs and preparations they deemed corrupt or unwholesome.” Edward Kremers, Kremers and Urdang’s History of Pharmacy 111 (4th ed.1976). “In the 18th century, power to examine the shops of apothecaries, chemists and druggists was given to the College of Physicians ([in] 1723), and cases involving questionable drugs were judged by a court composed partly of physicians and partly of apothecaries ([in] 1730).” Id. at 111-12.
In this Nation, the Colony of Virginia passed an act in 1736 addressing the dispensing of more drugs than was “necessary or useful” because that practice had become “dangerous and intolerable.” Id. at 158.[4] The Territory of Orleans (Louisi *495 ana) passed an act in 1808 requiring a diploma and an examination in order for pharmacists to dispense drugs and thus grant access to the public; Louisiana also prohibited the sale of deteriorated drugs and restricted the sale of poisons. Id. at 182-84, 214; see David L. Cowen, The Development of State Pharmaceutical Law, Pharmacy in History, Vol. 37 No. 2, 1995, at 49, 54 (noting that the 1808 act prohibited the sale of drugs that were “injured, moulded, discomposed, or sophisticated” and placed restrictions on the sale of “any suspicious or dangerous remedy”). South Carolina enacted legislation in 1817 requiring pharmacists to obtain licenses, Kremers, supra, at 184, 214, followed by Georgia in 1825 and Alabama in 1852, id. at 214. By 1870, at least twenty-five states or territories had statutes regulating adulteration, and a few others had laws addressing poisons. Id. at 216. The history of drug regulation in this country does not evidence a tradition of protecting a right of access to drugs; instead, it evidences government responding to new risks as they are presented. See Cowen, supra, at 56 (“The history of state laws pertaining to pharmacy obviously reflect[s] the development of pharmacy scientifically, professionally, and economically.”). The majority’s historical analysis of the FDCA demonstrates that Congress has expressed a keen interest in regulating drugs as science has progressed. Congress has responded to evolving medical technology with evolving regulation. But, unlike the majority, I do not see how the decision by Congress to regulate an area of concern in the early part of the twentieth century demonstrates a fundamental right to be free from regulation today.
Nor does the majority’s analogy to Cruzan v. Director, Missouri Department of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), and forced medication at common law explain why there is a fundamental, deeply rooted right to “self-preservation,” Maj. Op. at 486, protecting a “terminally ill, mentally competent adult patient’s informed access to potentially life-saving investigational new drugs determined by the FDA after Phase I trials to be sufficiently safe for expanded human trials,” id. at 486. In Cruzan, the Supreme Court “assume[d] that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition,” although the Court indicated that “the dramatic consequences involved in [a particular] refusal of [life-sustaining] treatment would inform the inquiry as to whether the deprivation of that interest is constitutionally permissible.” 497 U.S. at 279, 110 S.Ct. 2841. The Court’s assumption that there is a right to refuse lifesaving treatment in some circumstances was predicated upon “the common-law rule that forced medication was a batteryf ] and the long legal tradition protecting the decision to refuse unwanted medical treatment.” Glueksberg, 521 U.S. at 725, 117 S.Ct. 2258 (discussing Cruzan); see Cruzan, 497 U.S. at 269, 110 S.Ct. 2841. But a tradition protecting individual freedom from life-saving, but forced, medical treatment does not evidence a constitutional tradition of providing affirmative access to a potentially harmful, and even fatal, commercial good.[5]
*496 In light of Cruzan’s discussion of the “right of a competent individual to refuse medical treatment,” see 497 U.S. at 277, 110 S.Ct. 2841 (emphasis added), the majority attempts to limit its new right to a patient who is “mentally competent” and has “informed access” to experimental drugs. Maj. Op. at 486. The majority never explains what mental competence, in this context, would require. As the FDA noted in response to the Alliance’s proposal, “with so little data available, it is hard to understand how a patient could be truly informed about the risks — or potential benefits — associated with the drug.” By injecting patients into an early stage of the FDA’s process for testing experimental drugs, the majority’s approach allows terminally ill patients to take experimental drugs unknowingly — that is, without anyone having knowledge of potential risks and benefits. I fail to see how such a right is supported by Cruzan. Cruzan rejected an argument that an incompetent person has a right to withdraw treatment absent intent expressed while competent and, instead, upheld a state’s requirement of clear and convincing prior evidence regarding an incompetent person’s wishes to withdraw treatment. 497 U.S. at 279-80, 110 S.Ct. 2841. As the Court explained, “[t]he difficulty with petitioners’ claim is that in a sense it begs the question: An incompetent person is not able to make an informed and voluntary choice to exercise a hypothetical right to refuse treatment or any other right.” Id. at 280, 110 S.Ct. 2841. Under the majority’s decision, terminally ill patients seem to have a right to make an uninformed and involuntary choice.
It does not help the majority’s cause that the Supreme Court has rejected several similar challenges to the FDCA and related laws brought on statutory grounds. See, e.g., Raich, 545 U.S. at-, 125 S.Ct. at 2212 (“the dispensing of new drugs, even when doctors approve their use, must await federal approval”); United States v. Rutherford, 442 U.S. 544, 552, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) (“we are persuaded by the legislative history and consistent administrative interpretation of the [FDCA] that no implicit exemption for drugs used by the terminally ill is necessary to attain congressional objectives”); cf. Oakland, 532 U.S. at 490, 121 S.Ct. 1711 (with respect to whether there is an implied “medical necessity” exemption to prosecution for marijuana use under the Controlled Substances Act, generally speaking, “[w]hether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial inference”) (quotation marks omitted). To be sure, the Supreme Court has not addressed the constitutional argument raised by the Alliance. But contrary to the tradition asserted by the majority, there is a tradition of courts rejecting arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government.[6]
*497 The decision to procure and use experimental drugs has never enjoyed legal protection, let alone risen to the level of a “fundamental right[] and libert[y] which [is], objectively, deeply rooted in this Nation’s history and tradition.” Glucksberg, 521 U.S. at 720-21, 117 S.Ct. 2258 (quotation marks omitted). The amendments made to the FDCA by Congress throughout the twentieth century, see Maj. Op. 481-483, show that Congress, and the FDA, have responded continuously to new risks presented by an evolving technology. Indeed, because the risks and benefits presented by new experimental drugs are different with each new drug, the majority is not even sure what level of access its constitutional right will provide. The majority suggests that terminally ill patients have a right to “potentially life-saving treatment,” id. at 481, although the majority appears to exempt the Controlled Substances Act and state regulation from its constitutional right, id. at 478, 479 & n. 11. The majority’s vague allusion to potentially life-saving drugs demonstrates its difficulty in explaining what drugs its constitutional right protects. That difficulty arises because at issue here is a novel and unfamiliar area of science. The Alliance contends that patients would be better served by allowing them to assume unknown risks regardless of whether any benefit of an experimental drug remains uncertain. The FDA disagrees and concludes that terminally ill patients will be best served by receiving experimental drugs only when *498 there is “reasonable knowledge for patients and physicians of their likely clinical benefit and their toxicity.” But “[t]he only certain thing that can be said about the present state of knowledge and therapy ... is that science has not reached finality of judgment .... Certainly, denial of constitutional power ... to Congress in dealing with a situation like this ought not to rest on dogmatic adherence to one view or another on controversial psychiatric issues.” Greenwood v. United States, 350 U.S. 366, 375-76, 76 S.Ct. 410, 100 L.Ed. 412 (1956). Greenwood addressed an issue of psychiatry, but the same principle applies to the disputed scientific and medical issues in this case. In my view, the majority has made its own judgment about the medical benefits and risks of providing experimental drugs to terminally ill patients. That is a role Congress has rightly occupied and has, through the exercise of its Article I powers, delegated to the FDA for enforcement.
Our Nation’s “ ‘concept of ordered liberty,’ ” Glucksberg, 521 U.S. at 721, 117 S.Ct. 2258 (quoting Palko, 302 U.S. at 325-26, 58 S.Ct. 149), does not contemplate that judges should resolve the scientific uncertainties presented by experimental drugs. The Supreme Court has “recognized repeatedly the ‘uncertainty of diagnosis in this field and the tentativeness of professional judgment.’ ” Jones v. United States, 463 U.S. 354, 365 n. 13, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (quoting Greenwood, 350 U.S. at 375, 76 S.Ct. 410) (rejecting an argument that Congress could not constitutionally provide for commitment of the mentally ill based upon a prior criminal act because, a litigant argued, his proffered psychiatric research showed that prior dangerous acts do not predict future dangerousness). “The lesson [the Court] ha[s] drawn is not that government may not act in the face of this uncertainty, but rather that courts should pay particular deference to reasonable legislative judgments.” Jones, 463 U.S. at 365 n. 13, 103 S.Ct. 3043. In my view, the majority’s approach injects courts into unknown questions of science and medicine and does so contrary to the expressed will of Congress and the Executive and to the deference courts owe the democratic branches on such controversial matters.
“These disagreements” over scientific and medical issues “do not tie the [Government’s] hands in setting the bounds of its ... laws. In fact, it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes.” Kansas v. Hendricks, 521 U.S. 346, 356-60 & n. 3, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (state’s civil commitment statute comported with substantive due process in requiring commitment of a pedophile where “psychiatric professionals [were] not in complete harmony in casting pedophilia ... as ‘mental illnesses;’ ” although other states would not have required civil commitment, legislature was due wide latitude in light of medical disagreement). The majority suggests that drugs which have completed Phase I testing bear a sufficiently small medical risk. The majority confidently makes that scientific judgment, but I cannot. These drugs are experimental by their very nature. Unlike the FDA, see 21 U.S.C. § 355(n), we do not have Congressionally-provided scientific advisory panels at our disposal. “When Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices.” Marshall v. United States, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974).
*499 Our Nation’s history and traditions contemplate that the democratic branches will achieve balances between the uncertain risks and benefits of medical technology. See Jacobson v. Massachusetts, 197 U.S. 11, 30, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (“We must assume that, when the statute in question was passed, the legislature ... was not unaware of these opposing theories, and was compelled, of necessity, to choose between them. It was not compelled to commit a matter involving the public health and safety to the final decision of a court or jury. It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease.”). Our Nation’s concept of ordered liberty, along with our traditions and history, do not call for courts to usurp the judgment of the scientific and medical communities, expressed through Congress and the Executive Branch, that science does not warrant allowing the early access to experimental drugs the Alliance demands.
III.
The majority’s new right to procure and use experimental drugs raises a number of vexing questions that are now constitutional issues, potentially insulated from the tug and pull of the political process. If a terminally ill patient has such a right, are patients with serious medical conditions entitled to the benefit of the same logic and corresponding access? If an indigent cannot afford potentially life-saving treatment, would the Constitution mandate access to such care under the right recognized by the majority? Can a patient access any drug (ie., marijuana for medicinal purposes, see Raich, 545 U.S. at -, 125 S.Ct at 2215) if she believes, in consultation with a physician, it is potentially life-saving? Would the majority’s right guarantee access to federally-funded stem cell research and treatment? Perhaps most significantly, what potential must a treatment have in order for the Constitution to mandate access?
Because the majority does not answer this last question, the District Court faces an impossible task on remand. The majority concludes that the District Court must “determine whether the FDA’s policy barring access to post-Phase I investigational new drugs by terminally ill patients is narrowly tailored to serve a compelling governmental interest.” Maj. Op at 486. As a preliminary matter, the majority never explains why the District Court must determine that the FDA has a compelling, narrowly tailored interest in preventing access to all drugs that have passed or will pass Phase I. Just this term, the Supreme Court reminded the Court of Appeals that “when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. . We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force .... ” Ayotte v. Planned Parenthood of N. New England, — - U.S. -,-, 126 S.Ct. 961, 967, 163 L.Ed.2d 812 (2006) (citing United States v. Raines, 362 U.S. 17, 20-22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)). Rather than requiring the District Court to determine whether all terminally ill patients should have access to all experimental drugs after Phase I testing, it remains unclear why the District Court should not undertake the more restrained inquiry of whether the majority’s right guarantees access to the specific drugs sought by individual members of the Alliance.
Under the majority’s facial approach, the District Court must examine every drug undergoing FDA testing and every drug that may ever undergo FDA testing. It must then evaluate whether the FDCA’s *500 prohibition on access to unapproved drugs and corresponding exemptions for limited access serve a compelling interest and are narrowly tailored in light of all of the different potential risks and benefits of all experimental drugs and the needs of all terminally ill patients. Although the Government most likely will show that it has a compelling interest in regulating access to drugs with unknown toxicity and the potential to hasten death, the unknown risks and benefits of these experimental drugs will make nearly impossible a judicial examination of whether some level of access short of a prohibition would be more narrowly tailored to protect the majority’s constitutional right of access.
Moreover, the level of benefit a patient will have to show, in order to demonstrate that under the majority’s right a drug is potentially life-saving, remains an enigma. Whatever the majority means by “potentially,” its use of that term suggests that some drugs will not demonstrate enough potential benefit, while simultaneously presenting extraordinary risks. Considering the potential benefits of an experimental drug in light of its risks will require the District Court to step into the role of the FDA. Before today, scientists and physicians at the FDA, in consultation with the greater scientific and medical communities through scientific advisory panels, applied limited and often disputed scientific knowledge about an experimental drug in determining what level of access should be given to terminally ill patients and what medical circumstances warrant such access. Under the majority’s approach, the United States District Court for the District of Columbia must now evaluate limited scientific knowledge about a Phase I drug and determine whether that drug is potentially life-saving enough to require constitutional protection.
Because the Alliance has failed to present objective evidence establishing a deeply rooted right to procure and use experimental drags, I would apply rational basis review to its due process challenge. See Glucksberg, 521 U.S. at 728, 117 S.Ct. 2258. As the Supreme Court held in rejecting a challenge by terminally ill patients claiming that the FDCA’s safety requirement did not apply to them, “the [FDA] generally considers a drug safe when the expected therapeutic gain justifies the risk entailed by its use. For the terminally ill, as for anyone else, a drug is unsafe if its potential for inflicting death or physical injury is not offset by the possibility of therapeutic benefit.” Rutherford, 442 U.S. at 555-56, 99 S.Ct. 2470. Although terminally ill patients desperately need curative treatments, their death can certainly be hastened by the use of a toxic drug. Prior to distribution of a drug outside of controlled studies, the Government has a rational basis for ensuring that there is a scientifically and medically acceptable level of knowledge about the risks and benefits of such a drug. I would affirm the decision of the District Court.

. See Maj. Op at 478 (“The Alliance’s claim also does not challenge ... the government's authority to regulate substances deemed harmful to public health, safety, and welfare.”); id. (suggesting that only the "side effects of the investigational new drugs may still be in question after the Phase I trials have been completed,” and not addressing the fact that later studies address risks, safety, and the overall benefit-risk relationship of a new drug) (emphasis added); id. at 482 ("Only in 1962 did Congress require drug manufacturers to provide empirical evidence of the effectiveness of a drug as opposed to *489 merely the drug’s safety.”); id. at 483 ("Government regulation of drugs premised on concern over a new drug's efficacy, as opposed to its safety, is of recent origin.”).

. Section 355(n)(3) of Title 21, United States Code, provides:
The Secretary shall make appointments to each panel ... so that each panel shall consist of—
(A)members who are qualified by training and experience to evaluate the safety and effectiveness of the drugs to be referred to the panel and who, to the extent feasible, possess skill and experience in the develop-merit, manufacture, or utilization of such drugs;
(B) members with diverse expertise in such fields as clinical and administrative medicine, pharmacy, pharmacology, pharmacoeconomics, biological and physical sciences, and other related professions;
(C) a representative of consumer interests, and a representative of interests of the drug manufacturing industry not directly affected by the matter to be brought before the panel; and
(D) two or more members who are specialists or have other expertise in the particular disease or condition for which the drug under review is proposed to be indicated.

. In an effort to support its inferences from common law interests, the majority briefly turns to several privacy cases, see Maj. Op. at 481 n. 12, 485, cases that the majority earlier concludes are not necessary to support its holding, see id. at 481. The majority misses the critical distinction this case presents. The Supreme Court has never suggested that an individual has a right to override the government’s regulation of drug safety and to take drugs with, at best, unknown risks and, at worst, fatal consequences.

. Specifically, Virginia's act regulated "the Practice of Physic[] in this Colony.” Id. The Act noted that physic (the art or practice of healing disease, by, among other things, dispensing drugs) "is most commonly taken up and followed, by Surgeons, Apothecaries, or such as have only served Apprenticeships to those Trades, who often prove very unskillful in the Art of a Physician” and sought to address the concern that
too often, for the Sake of making up long and expensive Bills, [surgeons, apothecaries, and their apprentices] load their Patients with greater Quantities thereof, than are necessaiy or useful, concealing all their Compositions, as well to prevent the Dis *495 covery of their Practice, as of the true Value of what they administer; which is become a Grievance, dangerous and intolerable, as well to the poorer Sort of People, as others.
Id. (emphasis added).

. The majority argues that "Cruzan recognized ... that an individual has a due process right to make an informed decision to engage in conduct, by withdrawing treatment, that will cause one’s death.” Maj. Op. at 484 (emphasis added). As Glueksberg specifically *496 noted, however, in rejecting the argument that there is a fundamental right to commit suicide and receive assistance in doing so (z.e., engage in conduct that will cause one's death), "although Cruzan is often described as a 'right to die' case, [the Supreme Court] w[as], in fact, more precise: [the Court] assumed that the Constitution granted competent persons a 'constitutionally protected right to refuse lifesaving hydration and nutrition.' ” Glucksberg, 521 U.S. at 722-23, 117 S.Ct. 2258 (quoting Cruzan, 497 U.S. at 279, 110 S.Ct. 2841) (emphasis added).

. No circuit court has acceded to an affirmative access claim. See, e.g., Mitchell v. Clayton, 995 F.2d 772, 775 (7th Cir.1993) ("most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of *497 treatment or provider''); N.Y. State Ophthalmological Soc’y v. Bowen, 854 F.2d 1379, 1389 (D.C.Cir.1988) ("We disagree that the constitutional right to privacy comprehensively protects all choices made by patients and their physicians or subjects to 'strict scrutiny’ all government interference with choice of medical treatment. There is no basis under current privacy case law for extending such stringent protection to every decision bearing, however indirectly, on a person's health and physical well-being.”), cert. denied, 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989); Carnohan v. United States, 616 F.2d 117.0, 1122 (9th Cir.1980) (“Constitutional rights of privacy and personal liberty do not give individuals the right to obtain [the cancer drug] laetrile free of the lawful exercise of government police power.”); Rutherford v. United States, 616 F.2d 455, 457 (10th Cir. 1980) ("[T]he patient['s] ... selection of a particular treatment, or at least a medication, is within the area of governmental interest in protecting public health. The premarketing requirement of the [FDCA], 21 U.S.C. § 355, is an exercise of Congressional authority to limit the patient's choice of medication. This is clear under the [Supreme Court's] decisions ...."), on remand from 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979), cert. denied, 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980); see also Sammon v. N.J. Bd. of Med. Examiners, 66 F.3d 639, 645 n. 10 (3d Cir. 1995); United States v. Burzynski Cancer Research Inst., 819 F.2d 1301, 1313-14 (5th Cir. 1987); cf. Lambert v. Yellowley, 272 U.S. 581, 588, 590, 596-97, 47 S.Ct. 210, 71 L.Ed. 422 (1926) (where Congress determined, in implementing Prohibition, that "practicing physicians differ about the value of malt, vinous, and spirituous liquors for medicinal purposes, [and] that the preponderating opinion is against their use for such purposes,” the Court rejected a physician's claim of a constitutional right to "use ... such medicines and medical treatment as in his opinion are best calculated to effect [his patients'] cure and establish their health,” holding that "there is no right to practice medicine which is not subordinate ... to the power of Congress to make laws necessary and proper .... High medical authority being in conflict as to the medicinal value of spirituous and vinous liquors taken as a beverage, it would, indeed, be strange if Congress lacked the power to determine that the necessities of the liquor problem require a limitation of permissible prescriptions .... ”); Watson v. Maryland, 218 U.S. 173, 176, 30 S.Ct. 644, 54 L.Ed. 987 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine.”).