# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3837

_____

David Monson; Wayne Hauge,      *
                               *

         Appellants,       *
                               *    Appeal from the United States
      v.                        *    District Court for the
                               *    District of North Dakota.

Drug Enforcement Administration;     *
Department of Justice,            *
                               *

         Appellees.        *

_____

Submitted:  November 12, 2008
Filed:  December 22, 2009

_____

Before MELLOY, BOWMAN, and SMITH, Circuit Judges.

_____

BOWMAN, Circuit Judge.

David Monson and Wayne Hauge appeal from an order of the District Court[1] dismissing their action for a declaration that the Controlled Substances Act (CSA or Act), 21 U.S.C. §§ 801–971, does not apply to their planned cultivation of Cannabis sativa L. (cannabis) pursuant to licenses they obtained from the State of North Dakota. Monson and Hauge argue that the District Court erred by failing to accept as true the factual allegations in their complaint, by finding that cannabis cultivated for industrial

_____

[1]The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

use under state law is subject to regulation under the CSA, and by determining that Congress has authority under the Commerce Clause to regulate their cultivation of cannabis. The Drug Enforcement Administration (DEA) and the Department of Justice (DOJ) argue that although the District Court properly dismissed the complaint, the court should have dismissed on jurisdictional grounds. We affirm the judgment of the District Court in all respects.

Monson and Hauge are North Dakota farmers who wish to grow cannabis pursuant to state law legalizing and regulating the cultivation of "industrial hemp." N.D. Cent. Code § 4-41-01. They intend to sell parts of the harvested cannabis for industrial use. Both industrial hemp and the drug commonly known as marijuana derive from the plant designated Cannabis sativa L. In general, drug-use cannabis is produced from the flowers and leaves of certain strains of the plant, while industrial-use cannabis is typically produced from the stalks and seeds of other strains of the plant. All cannabis plants contain tetrahydrocannabinol (THC), the substance that gives marijuana its psychoactive properties, but strains of the plant grown for drug use contain a higher THC concentration than those typically grown for industrial use. Monson and Hauge acknowledge that the plants they seek to grow are of the species Cannabis sativa L. They contend, however, that cannabis grown for industrial purposes, i.e., industrial hemp as defined by the North Dakota statute, is not marijuana within the meaning of the CSA and thus is not subject to federal regulation. Monson and Hauge filed this lawsuit in the District Court seeking a declaration that their "cultivation of industrial hemp pursuant to and in accordance with the licenses issued . . . by the North Dakota Agriculture Commissioner does not and will not violate the" CSA. Compl. at 21. They assert that the CSA could not be applied to their cultivation of industrial hemp under state law without violating the Commerce Clause. The DEA and the DOJ filed a motion to dismiss for lack of jurisdiction or, in the alternative, for failure to state a claim upon which relief could be granted.

The District Court granted the DEA and DOJ's motion to dismiss. The court declined to dismiss on jurisdictional grounds and, proceeding to the merits, held that the cannabis plants Monson and Hauge proposed to cultivate fell within the CSA's definition of marijuana and thus that their planned cultivation of industrial hemp under state law was subject to regulation under the CSA. The court also concluded that Congress has authority under the Commerce Clause to regulate the manufacture of all cannabis plants, regardless of the THC concentration or ultimate use of those plants. Monson and Hauge appeal the dismissal of their complaint, and the DEA and the DOJ appeal the District Court's jurisdictional rulings. We first discuss the federal and state statutes before turning to the specific issues raised on appeal.

The CSA establishes a comprehensive federal system to regulate the manufacture and distribution of controlled substances, making it unlawful to "manufacture, distribute, or dispense" any controlled substance "[e]xcept as authorized by" the Act. 21 U.S.C. § 841(a)(1). The CSA defines "manufacture" to include "production," id. § 802(15), and it in turn defines "production" to include the "planting, cultivation, growing, or harvesting of a controlled substance," id. § 802(22).

The CSA categorizes controlled substances into five separate schedules, depending on the characteristics of a particular substance. Id. §§ 811, 812. Marijuana[2] is listed in Schedule I, the most restrictive schedule, because, like the other substances listed, it "has a high potential for abuse," "no currently accepted medical use in treatment in the United States," and "a lack of accepted safety for use . . . under medical supervision." Id. § 812(b)(1)(A)–(C). Marijuana[3] is defined in the CSA to

---

[2]Although the CSA uses the spelling "marihuana," we use the more common spelling "marijuana."

[3]The CSA defines marijuana to include "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such

include "all parts of the plant Cannabis sativa L." and anything made therefrom except, in general, mature stalks, fiber produced from those stalks, sterilized seeds, and oil from the seeds. Id. § 802(16). Under the CSA, any person seeking to manufacture a Schedule I controlled substance must obtain a registration from the DEA. Id. §§ 822, 823. Before issuing a registration, the DEA considers several factors, including the applicant's "maintenance of effective controls against diversion," "compliance with applicable State and local law," "prior conviction record," and "past experience in the manufacture of controlled substances." Id. § 823(a).

In 1999, the North Dakota Legislative Assembly legalized the growth, possession, and sale of "industrial hemp." N.D. Cent. Code § 4-41-01. The state statute defines industrial hemp as "(cannabis sativa l.), having no more than three-tenths of one percent" THC. Id. Unlike the CSA, the North Dakota statute distinguishes among cannabis plants based on THC concentration. The state requires licensing for persons wishing to cultivate industrial hemp, imposes strict THC limits in an effort to prevent the cultivation of cannabis plants for drug use, and attempts to ensure that only those parts of the industrial hemp plant that are excluded from the CSA's definition of marijuana will leave a farmer's property and enter interstate commerce. Id. § 4-41-02. Recognizing that industrial hemp as defined by the state is regulated under the CSA as marijuana, the state statute originally provided that any person seeking to grow industrial hemp in North Dakota was required to comply not only with the state's licensing requirements but also with the CSA's registration requirements.

Shortly after the state statute was enacted, the North Dakota Commissioner of Agriculture (Commissioner) requested that the DEA waive the CSA's registration

---

plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination." 21 U.S.C. § 802(16).

requirement for all North Dakota farmers seeking to grow industrial hemp as defined and regulated by state law. In February 2007, the DEA denied the Commissioner's request, noting that "Congress expressly commanded the [DOJ] to take the lead in controlling licit and illicit drug activity through enforcement of the CSA. . . . [F]or [the] DEA to simply turn over to any state the agency's authority and responsibility to enforce the CSA . . . would be directly at odds with the Act." Letter from DEA to Comm'r at 2–3 (Feb. 1, 2007). The DEA also cautioned that registration pursuant to the CSA was necessary for the cultivation of industrial hemp because, unlike the North Dakota statute, the CSA includes *all* Cannabis sativa L. plants in its definition of marijuana, regardless of THC concentration.

Thereafter, the Commissioner submitted to the DEA applications for registration on behalf of Monson and Hauge for their proposed industrial hemp cultivation. In March 2007, less than one month after submitting those applications, the Commissioner sent the DEA a letter demanding action on the applications by April 1, 2007. The DEA responded that the Commissioner's proposed deadline was unrealistic given the agency's obligations to comply with notice and comment requirements, conduct background investigations, and complete onsite inspections of Monson and Hauge's manufacturing facilities. The North Dakota Legislative Assembly then amended the state statute by eliminating the DEA-registration requirement. In light of the DEA's pronouncements, however, Monson and Hauge did not immediately begin cultivating industrial hemp under their state licenses. Instead, they filed a lawsuit in the District Court seeking a declaration that the CSA does not apply to persons seeking to cultivate industrial hemp pursuant to North Dakota law.

Before we address the claims raised on appeal by Monson and Hauge, we first address the DEA's various complaints of jurisdictional error. The agency argues that the District Court erred in exercising jurisdiction over the complaint because Monson and Hauge lacked standing to pursue their claims; their claims were unripe; and even if their claims were justiciable, the CSA confers exclusive jurisdiction over the matter

to the federal courts of appeals. We review the District Court's determination regarding subject matter jurisdiction de novo. See Keene Corp. v. Cass, 908 F.2d 293, 296 (8th Cir. 1990).

"Article III standing requires a party to show actual injury, a causal relation between that injury and the challenged conduct, and the likelihood that a favorable decision by the court will redress the alleged injury." Minn. Citizens Concerned for Life v. Fed. Election Comm'n, 113 F.3d 129, 131 (8th Cir. 1997). The DEA argues that Monson and Hauge have not suffered an actual injury because they have not been subjected to or threatened with federal criminal prosecution for a violation of the CSA. But a party need not expose himself "to arrest or prosecution under a criminal statute in order to challenge [that] statute in federal court." Ark. Right to Life State Political Action Comm. v. Butler, 146 F.3d 558, 560 (8th Cir. 1998). Instead, "[w]hen government action . . . is challenged by a party who is a target or object of that action, . . . 'there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it.'" Minn. Citizens Concerned for Life, 113 F.3d at 131 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561–62 (1992) (alterations by this Court)).

We agree with the District Court that Monson and Hauge have adequately established that they are targets of DEA action and thus have shown actual injury sufficient to confer standing. Monson and Hauge, experienced farmers with the skills necessary to cultivate industrial hemp, applied for and obtained state licenses to engage in that activity. They have unequivocally declared their intent to cultivate industrial hemp and have clearly described the specifics of their proposed farming operations, including the location and number of plants to be grown and the harvesting and processing procedures to be utilized. The DEA's letter to the Commissioner plainly states that the agency considers Monson and Hauge's proposed cultivation of industrial hemp pursuant to their state licenses to be the manufacture of a Schedule I controlled substance that, under the CSA, is unlawful without a registration from the

agency. As noted by the District Court, Monson and Hauge "arguably stand ready, willing, and able to cultivate industrial hemp under their state licenses and they face an imminent threat of federal criminal prosecution if they do so." Order of Nov. 28, 2007, at 11. When a plaintiff "alleges a threat of prosecution that 'is not imaginary or wholly speculative,'" he has standing to challenge a statute. St. Paul Area Chamber of Commerce v. Gaertner, 439 F.3d 481, 485 (8th Cir. 2006) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 302 (1979)). In these circumstances, Monson and Hauge do not allege merely a conjectural or hypothetical injury. See N.H. Hemp Council, Inc. v. Marshall, 203 F.3d 1, 5 (1st Cir.) (concluding that the threat of federal prosecution was realistic enough to establish actual injury—and standing—where the DEA "made clear . . . by its conduct" that it considered industrial hemp cultivation unlawful under the CSA), cert. denied, 531 U.S. 828 (2000). Because Monson and Hauge have adequately established actual injury, they have standing to pursue their claims.

The DEA also contends that Monson and Hauge's claims are not ripe for review because they have not exhausted the agency's administrative process. According to the DEA, Monson and Hauge should be required to wait for the agency's decision on their CSA registration applications before seeking judicial review. If the DEA denies registration, Monson and Hauge may then seek judicial review. The DEA's argument was squarely addressed and rejected by the First Circuit in New Hampshire Hemp Council. In that case, a farmer sought a declaration from the district court that industrial hemp was not marijuana under the CSA. The DEA argued that before pursuing declaratory relief, the farmer was required to comply with the CSA's registration requirements. The First Circuit rejected the DEA's argument, noting that

> whether viewed as a ripeness objection or one based on a failure to exhaust remedies, the objection is unsound here, even if there were some realistic prospect of a license for [the farmer]. [The farmer]'s position is that his proposed production of industrial products is not marijuana production under the [CSA] and therefore not subject to the [CSA] at all,

whether as a prohibition or licensing scheme. If he were correct, it is
hard to see why he should be forced to apply for a license.

Id. at 5–6. The same holds true in this case. Monson and Hauge applied for registration under the CSA only because state law initially required such registration—in addition to a state license—for the cultivation of industrial hemp. After the Commissioner received written notice from the DEA that those registration applications would be treated under the CSA as applications to manufacture a Schedule I controlled substance, the North Dakota legislature amended state law to eliminate the provision requiring DEA registration for the cultivation of industrial hemp. Like the farmer in New Hampshire Hemp Council, Monson and Hauge contend that their proposed activities are not governed by the CSA and are outside the reach of the DEA's statutory authority. We agree with the First Circuit, and we conclude that in the circumstances of this case, Monson and Hauge should not be required to apply for registration pursuant to a regulatory scheme that they contend does not apply to their activities in the first place.

We also note that "[a] party may be excused from exhausting administrative remedies . . . if further administrative procedures would be futile." Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp., 440 F.3d 992, 1000 (8th Cir. 2006). As described above, the DEA has previously indicated in writing that applications for registration to grow industrial hemp in North Dakota will be treated under the CSA as applications to manufacture a Schedule I controlled substance. The DEA has not advised this Court that it will change its position on the treatment of industrial hemp under the CSA, and Monson and Hauge should not be required to further pursue a futile course of action.

The DEA cites our decision in Great Plains Coop v. Commodities Futures Trading Commission, 205 F.3d 353 (8th Cir. 2000), in support of its contention that Monson and Hauge cannot be allowed to circumvent agency procedures by filing a

lawsuit before the agency rules on their registration applications. We find Great Plains to be distinguishable. The statute at issue in that case, the Commodity Exchange Act, provides that a person aggrieved by a Commodities Futures Trading Commission (CFTC) decision or targeted by a CFTC administrative action is entitled to a full hearing on the record before the agency or an administrative law judge (ALJ). See 7 U.S.C. §§ 8, 9. We held in Great Plains that the complaint filed in the district court was "an impermissible attempt to make an 'end run' around the statutory scheme." 205 F.3d at 355. The DEA cites no authority in the CSA entitling an aggrieved person to a similarly exhaustive administrative appeal process. Moreover, the plaintiff in Great Plains had not received any indication from the ALJ that the CFTC's interpretation of the Commodity Exchange Act would be upheld—the administrative process was ongoing and the outcome was not foreseeable. Here, by contrast, the DEA has already indicated in no uncertain terms its intent to treat industrial hemp as a Schedule I controlled substance under the CSA and to require registration pursuant to the Act before industrial hemp can be grown under North Dakota law. In these circumstances, we cannot say that the District Court erred by concluding that further attempts to exhaust the administrative process would be futile.

The DEA argues that even if Monson and Hauge have standing and their claims are ripe for review, the CSA strips subject matter jurisdiction from the District Court and vests it exclusively in the federal courts of appeals. Under the CSA, "any person aggrieved by a final decision" of the DEA under the Act "may obtain review of the decision" in the appropriate court of appeals. 21 U.S.C. § 877. Explicit in this grant of jurisdiction to the courts of appeals is the requirement that the DEA issue a "final decision" under the Act. Here, Monson and Hauge did not file an action in the District Court to challenge a final decision of the DEA under the Act. They did not challenge, for example, the denial of a license application, the revocation of an existing license, or the promulgation of a rule. Rather, Monson and Hauge filed their complaint in the District Court to obtain a declaration that the CSA does not apply to their planned cultivation of industrial hemp under North Dakota state law and that, as a result, they

cannot be prosecuted under the Act. In exercising jurisdiction over the action, the District Court reasoned that because there was no final decision of the DEA under the CSA at issue, § 877 did not bar Monson and Hauge from seeking declaratory relief in that court. We agree.

The district court in PDK Labs Inc. v. Reno, 134 F. Supp. 2d 24, 29 (D.D.C. 2001), exercised jurisdiction over a challenge to a DEA interpretive letter after concluding that the letter was not "a final determination, finding, or conclusion within the meaning of § 877." In Neogen Corp. v. U.S. Department of Justice, No. 05-506-JBC, 2006 WL 3422691, at *9 (E.D. Ky. Nov. 28, 2006), the district court, citing PDK, asserted jurisdiction over an action because the DEA's denial of authorization to import a Schedule I substance was not a final decision under the CSA; "the denial was merely the initial step toward the attainment of a final agency position." And in Novelty, Inc. v. Tandy, No. 1:04-CV-1502-DFH-TAB, 2006 WL 2375485, at *7 (S.D. Ind. Aug. 15, 2006), the district court determined that it had jurisdiction over an action challenging the DEA's practice of using interpretive letters to revise substantive compliance requirements, a practice which the plaintiff claimed violated notice and comment provisions. The court in Novelty, Inc., held that "the most persuasive view is that § 877 does not apply where there has been no formal finding, conclusion, or determination based on a record that provides a meaningful basis for judicial review." Id. at *3.

The DEA cites the decision of the District of Columbia Circuit in John Doe, Inc. v. Drug Enforcement Agency, 484 F.3d 561 (D.C. Cir. 2007), in support of its argument that § 877 strips the District Court of subject matter jurisdiction to consider Monson and Hauge's complaint. In John Doe, Inc., the DEA denied an application for registration to import a generic version of a Schedule I controlled substance, and the applicant sought redress in the district court. The district court dismissed the case for lack of subject matter jurisdiction, citing § 877. The District of Columbia Circuit affirmed, holding that the DEA's denial of the registration application was "final" for

-10-

purposes of § 877 and that the sole avenue for judicial review was through the courts of appeals. 484 F.3d at 570. Unlike the applicant in John Doe, Inc., however, Monson and Hauge did not file their complaint in the District Court seeking review of a final action by the DEA under the CSA. Instead, Monson and Hauge seek a declaration that they cannot be criminally prosecuted for cultivating industrial hemp pursuant to their state-issued licenses.

We are not convinced that § 877 precluded the District Court from assuming jurisdiction over the action. There was no final decision of the DEA to be reviewed and the crux of Monson and Hauge's action is a challenge to the applicability of the CSA to their proposed activities and the authority of the DEA under the CSA to regulate those activities in the first instance. In these circumstances and on this record, we conclude that the District Court had jurisdiction to consider the claims for declaratory relief raised by Monson and Hauge.

We now turn to Monson and Hauge's contention that the District Court erred in dismissing their complaint on the merits. "We review the grant of a motion to dismiss de novo, taking all well pleaded factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." Katun Corp. v. Clarke, 484 F.3d 972, 975 (8th Cir. 2007). But we, like the District Court, are free to "ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." Wiles v. Capitol Indem. Corp., 280 F.3d 868, 870 (8th Cir. 2002). Dismissal is proper "'if it appears beyond doubt that the plaintiff can prove no set of facts to warrant a grant of relief.'" Knieriem v. Group Health Plan, Inc., 434 F.3d 1058, 1060 (8th Cir.), cert. denied, 548 U.S. 905 (2006).

Monson and Hauge first argue that in granting the DEA's motion to dismiss, the District Court erred by failing to "accept as true the allegations that the industrial hemp plant itself is useless as drug marijuana and that there is no way industrial hemp

-11-

could be diverted to use" as drug marijuana. Br. of Appellants at 20. This argument is without merit. The "facts" that Monson and Hauge claim were improperly rejected by the District Court amount to nothing more than "sweeping legal conclusions" and "unwarranted inferences" that the court was not required to consider in ruling on the motion to dismiss. Wiles, 280 F.3d at 870.

Under the CSA, marijuana is defined to include *all* Cannabis sativa L. plants, regardless of THC concentration. See 21 U.S.C. § 802(16). The CSA likewise makes no distinction between cannabis grown for drug use and that grown for industrial use.[4] See id. In United States v. White Plume, 447 F.3d 1067, 1069 (8th Cir. 2006) (quoting ordinance) (alterations in White Plume), we held that "industrial hemp," defined by tribal ordinance as "[a]ll parts and varieties of the plant *Cannabis sativa*" that "contain a [THC] concentration of one percent or less by weight," was subject to regulation as a Schedule I controlled substance under the CSA because as a species of Cannabis sativa L., it fell squarely within the definition of marijuana set forth in the CSA. We also noted that "[t]he language of the CSA unambiguously bans the growing of marijuana, regardless of its use," id. at 1072, and we concluded that "[b]ecause the CSA does not distinguish between marijuana and hemp in its regulation, and because farming hemp requires growing the entire marijuana plant which at some point contains psychoactive levels of THC, the CSA regulates the farming of hemp," id. at 1073. Considering the legislative history of the CSA, we found "no evidence that Congress intended otherwise" than to ban the growth of *all* varieties of the Cannabis sativa L. plant absent compliance with the registration requirements of the CSA. Id. at 1072; see also N.H. Hemp Council, 203 F.3d at 6–8 (concluding that cannabis cultivated for industrial use and possessing a low THC concentration is nevertheless marijuana under the CSA and is subject to regulation by the DEA); cf. United States v. Curtis, 965 F.2d 610, 616 (8th Cir. 1992) (observing

---

[4]As previously noted, the statutory definition of marijuana excludes certain parts of the Cannabis sativa L. plant not relevant to this discussion.

that male marijuana plants, which may have lower THC concentrations than female plants, are still marijuana plants for sentencing purposes).

In ruling on the DEA's motion to dismiss, the District Court was not required to accept as true Monson and Hauge's alleged facts that were nothing more than "unsupported conclusions, unwarranted inferences and sweeping legal conclusions" directly at odds with the CSA and Circuit precedent. Wiles, 280 F.3d at 870. In sum, the District Court properly construed and dismissed the complaint; the court did not err in rejecting Monson and Hauge's alleged facts, and it properly concluded that industrial hemp as defined by the North Dakota statute is marijuana for purposes of the CSA.

Monson and Hauge next argue that the District Court erred by concluding "that the CSA can constitutionally be extended to reach the proposed intrastate cultivation of industrial hemp under North Dakota law." Br. of Appellants at 27. According to Monson and Hauge, because the only portion of the industrial hemp plant that would leave their North Dakota farms and enter interstate commerce is the *unregulated* portions of the plant—the mature stalk, fiber, non-viable seed and oil—Congress has no authority to regulate their state-sanctioned cultivation of cannabis. It is well established, and Monson and Hauge do not dispute, that enactment of the CSA was within Congress's authority under the Commerce Clause. See, e.g., United States v. Davis, 288 F.3d 359, 362 (8th Cir.) (upholding the CSA as a valid exercise of congressional authority under the Commerce Clause), cert. denied, 537 U.S. 822 (2002). What Monson and Hauge do dispute, however, is Congress's authority under the Commerce Clause to regulate what they describe as purely intrastate activity. Like the District Court, we find this argument unavailing.

Congress possesses the authority both "[t]o regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3, and to pass legislation that constitutes a reasonable means to effectuate such regulation, id. art. I,

-13-

§ 8, cl. 18. Pursuant to this authority, Congress "may regulate the use of the channels of interstate commerce"; "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and "those activities that substantially affect interstate commerce." United States v. Lopez, 514 U.S. 549, 558, 559 (1995).

In connection with its enactment of the CSA, Congress issued findings and declarations regarding the effects of drug use on the public health and welfare and the effects of intrastate drug activity on interstate commerce. Congress acknowledged that "[m]any of the drugs included within [the CSA] have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people," 21 U.S.C. § 801(1), but it found that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people," id. § 801(2). Although Congress found that traffic in controlled substances could be largely attributed to interstate and foreign commerce, it nevertheless declared that manufacture, local distribution, and possession have a "substantial and direct effect upon interstate commerce," id. § 801(3), contributing "to swelling the interstate traffic in such substances," id. § 801(4). Thus, according to Congress, because "[c]ontrolled substances manufactured and distributed intrastate cannot be differentiated from [those] manufactured and distributed interstate, . . . [f]ederal control of the intrastate . . . traffic in controlled substances is essential to the effective control of the interstate . . . traffic" in those substances. Id. § 801(5)–(6).

The Supreme Court's decision in Gonzales v. Raich, 545 U.S. 1 (2005), disposes of Monson and Hauge's argument that the CSA cannot be interpreted to reach their intrastate cultivation and processing of cannabis without violating the Commerce Clause. In Raich, users and growers of medical marijuana under a California statute sought a declaration that the CSA was unconstitutional as applied to their intrastate activities. The Supreme Court held that Congress has authority under the Commerce Clause to regulate marijuana that is grown and consumed intrastate for

non-commercial, personal medical reasons. The Court explained that "Congress has the power to regulate activities that substantially affect interstate commerce," and that as part of this well-established power, Congress is permitted to "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." Id. at 17. The Court held that it was not necessary to determine whether the activities in question, "taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding. Id. at 22. Because of "the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere and concerns about diversion into illicit channels," the Court had "no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." Id. (citation omitted). The fact that the CSA was likely to impact some purely intrastate activities was of no concern to the Court. Id.

Here, Monson and Hauge's proposed cultivation of cannabis falls more squarely within the scope of Congress's Commerce Clause authority than did the Raich plaintiffs' proposed cultivation of marijuana. Unlike the Raich plaintiffs, who sought to grow marijuana plants on a small scale for their personal medical use, Monson and Hauge seek to grow cannabis on a large scale for the undeniably commercial purpose of generating products for sale in interstate commerce.[5]

Monson and Hauge's attempts to distinguish Raich are unpersuasive. They contend that because Congress chose to exclude certain components of the Cannabis sativa L. plant from the CSA's definition of marijuana, Congress "cannot

_____

[5]According to the Complaint, Hauge acquired a state license to cultivate up to 100 acres of industrial hemp from which he planned to supply other North Dakota farmers with seeds, and Monson obtained a state license to plant up to ten acres with 300 pounds of industrial hemp seeds in order to produce over 2.4 million industrial hemp plants. See Compl. at 12, 13.

constitutionally regulate *intrastate* state-regulated and licensed activity that results only in putting" those unregulated components into interstate commerce. Br. of Appellants at 29. This argument misses the mark. The question is not whether Congress *could* have decided to regulate a narrower class of economic activity than it chose to regulate. Rather, the question is whether Congress had any rational basis to conclude that the economic activity it chose to regulate—the manufacture of all marijuana plants, regardless of THC content and intended use—substantially affects interstate commerce. See Raich, 545 U.S. at 22 ("We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding.").

Congress's decision to regulate the manufacture of all marijuana plants—whatever their ultimate use—was a rational means of achieving one of Congress's primary objectives: "to control the supply and demand of controlled substances in both lawful and unlawful drug markets." Id. at 19; see also United States v. Moore, 423 U.S. 122, 135 (1975) (noting that in enacting the CSA, "Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels," and "[i]t was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic"). As we observed in White Plume, "'problems of detection and enforcement easily justify a ban [on Cannabis sativa L.] broader than the psychoactive variety of the plant.'" 447 F.3d at 1073 (quoting N.H. Hemp Council, 203 F.3d at 6) (alterations by this Court). It is likewise no answer to Congress's concern about enforcement problems to assert that "North Dakota law requires that no plant and no part of the plant regulated by the CSA may ever leave the farmer's property." Br. of Appellants at 33–34. The Supreme Court rejected a similar argument in Raich, observing that state restrictions on marijuana possession and cultivation "cannot serve to place [the challenged] activities beyond congressional reach." 545 U.S. at 29; see also id. at 41 ("Congress need not accept on faith that state law will be effective in maintaining a strict division between

-16-

a lawful market for 'medical' marijuana and the more general marijuana market.") (Scalia, J., concurring).

The CSA defines marijuana to include all Cannabis sativa L. plants, regardless of THC concentration or intended use. See 21 U.S.C. § 802(16). Congress had a rational basis for concluding that it was necessary to regulate the cultivation of all Cannabis sativa L. plants in order to maintain the CSA's highly regulated system of drug distribution and its controls against unlawful diversion of controlled substances. By regulating all Cannabis sativa L. plants, Congress, through the CSA, vested the DEA with the authority to determine whether a particular proposal for its growth is sufficiently controlled so as not to undermine the objectives of the Act. And any attempt by Monson and Hauge to draw distinctions between Cannabis sativa L. varieties for purposes of Commerce Clause analysis ignores the indisputable fact that they seek to engage in a commercial enterprise that will result in the introduction of goods into interstate commerce. Regardless of Congress's purpose, because cultivation of Cannabis sativa L. substantially affects the interstate market for commodities such as the fiber, seed, and oil of the plant, Congress may regulate that cultivation. The District Court properly rejected Monson and Hauge's Commerce Clause challenge.

We affirm the judgment of the District Court in all respects.
_____