**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1975
_____

UNITED STATES OF AMERICA

v.

JOHN ADAMS,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:21-cr-00144-001)
District Judge: Honorable Gerald A. McHugh
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 22, 2025

Before: HARDIMAN, McKEE, and AMBRO, *Circuit Judges*

(Filed: March 21, 2025)

Carina Laguzzi
Laguzzi Law
P.O. Box 30095

Philadelphia, PA 19103

   *Counsel for Appellant*

Kelly M. Harrell
Jacqueline C. Romero
Robert A. Zauzmer
Erica Kivitz
Office of United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

   *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

John Adams appeals his judgment of conviction and sentence after pleading guilty to sex trafficking and related offenses. On appeal, he principally argues that the Trafficking Victims Protection Act, 18 U.S.C. § 1591 *et seq.* (the Trafficking Act), does not apply to his conduct and that Congress lacked the power to enact that statute. Adams also contends that the District Court abused its discretion by denying his motion to withdraw his guilty plea. We will affirm.

I

## A

In early 2020, Adams picked up two girls who ran away from home, J.A. and S.H., and brought them to his home in Philadelphia. In exchange for giving them a place to stay, Adams required the girls, then aged 15 and 16, to have oral and vaginal sex with him several times and threatened to kick them out if they refused. Adams also directed the minors to engage in commercial sex. He used his cellphone to advertise the minors on the European website "megapersonals.eu" and collected a portion of the money paid to the minors for their sexual services. Adams instructed the minors to conceal their ages and activities, and he directed them to delete their text messages.

Several weeks later, J.A. and S.H. were found by law enforcement during a traffic stop. They told Federal Bureau of Investigation agents that they had been living with Adams and were forced to have sex with him and others. Authorities found inculpatory text messages between Adams and J.A. stored on J.A.'s cellphone that corroborated the minors' account. The officers did not recover S.H.'s phone until several weeks later. By that time, S.H. had deleted all sex-trafficking information from her phone at Adams's direction.

Hours after law enforcement found the juveniles, Adams went to the local police station to "clear his name." Supp. App. 48. He wrote a false exculpatory statement but admitted that he had taken J.A. and S.H. to his home. Days later, Adams solicited another minor, J.B., to help him cover up his sex-trafficking activities. With J.B.'s assistance, he recorded a conversation with J.B., S.H., and S.H.'s brother to exculpate himself and to blackmail S.H. if she cooperated with law enforcement. Adams paid J.B. for her participation in the

3

recording and paid S.H. and her brother to keep them quiet.

Adams later visited the FBI office in Philadelphia. He told the FBI agents that he was "Captain Save-a-Hoe" and that he knew J.A. and S.H. were minors. Supp. App. 50. Adams admitted that the girls had stayed with him and claimed they had paid him to do so. He denied "having a sexual conversation" with J.A. and S.H. or having a Megapersonals account, although he admitted emailing Megapersonals to ask about posting advertisements. Supp. App. 51. Contrary to Adams's story, the agents discovered that Adams had a Megapersonals account, visited its website many times, and posted online advertisements there at least twice.

B

A grand jury returned a six-count indictment, charging Adams with: sex trafficking of a minor and aiding and abetting the same in violation of 18 U.S.C. § 1591(a)(1), (b)(2), and (c) (Counts One and Two); tampering with evidence in violation of 18 U.S.C. § 1519 (Count Three); tampering with a witness in violation of 18 U.S.C. § 1512(b)(3) (Count Four); and making false statements in violation of 18 U.S.C. § 1001 (Counts Five and Six).

Adams's counsel moved to dismiss Counts One and Two for failure to state an offense, arguing that the Trafficking Act did not apply to Adams's conduct because Congress did not express its intent to federalize the prosecution of "local street crime prostitution." Dist. Ct. Dkt. No. 59 at 5. Adams also filed several pro se motions, including one entitled "Motion to Invalidate the Indictment as Being Unconstitutional As-Applied in Violation of the Treaty Clause, Tenth Amendment, Necessary and Proper Clause, and the United

4

States Constitution." Dist. Ct. Dkt. No. 55.

The District Court denied the pro se and counseled motions. The Court held that the Trafficking Act criminalized domestic sex trafficking and that Congress validly enacted the statute using its Commerce Clause power.

Adams eventually pleaded guilty to all six charges with a written plea agreement in which he reserved the right to challenge whether the Trafficking Act applied to his conduct. The Government agreed to recommend a within-Guidelines sentence and that Adams was eligible for a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).

Before sentencing, Adams filed a pro se motion asking the District Court to reconsider its order denying his motion to dismiss in part because "[t]his [sex-trafficking] statute is being used the same way the crack laws were being used against black people." Dist. Ct. Dkt. No. 161. Defense counsel also moved to withdraw the guilty plea, arguing that Adams was legally innocent, the Government's witnesses were not credible, and the Government had breached the agreement. Counsel also contended that Adams did not voluntarily agree to plead guilty because his prior counsel rendered ineffective assistance of counsel by inaccurately telling him that the Government could not ask for a sentence greater than fifteen years.

After the District Court denied Adams's motion to withdraw his guilty plea, the Government filed an amended sentencing memorandum, arguing that Adams was no longer eligible for the acceptance-of-responsibility downward adjustment because he had frivolously alleged that he was prosecuted based on his race and denigrated the credibility of

witnesses. At sentencing, the District Court rejected the Government's argument, calculated the Guidelines range as 360 months' to life imprisonment, and imposed a sentence of 300 months' imprisonment followed by ten years' supervised release.

In this timely appeal, Adams challenges the denials of his motion to dismiss Counts One and Two and his motion to withdraw his guilty plea.

## II

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291. We review Adams's statutory and constitutional arguments de novo. *United States v. Hodge*, 948 F.3d 160, 162 (3d Cir. 2020); *United States v. Singletary*, 268 F.3d 196, 198–99 (3d Cir. 2001).

## III

Counts One and Two of the indictment charged Adams with violating 18 U.S.C. § 1591(a) of the Trafficking Act, which punishes anyone who "knowingly . . . in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, [or] maintains . . . by any means a person" while "knowing . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). Adams argues that the statute does not apply to his conduct. We disagree.

## A

Relying on various references to the "international" or "transnational" sex trade in the congressional purposes and

6

findings underlying the Trafficking Act, Adams contends that Congress intended § 1591 to apply only to foreign sex trafficking. *See* 22 U.S.C. § 7101(b). As he sees it, his "wholly domestic" sexual exploitation of minors lies beyond the reach of the statute. Adams Br. 9.

Adams's argument flouts the text of § 1591, which punishes both foreign and domestic sex trafficking. "Because we presume that Congress' intent is most clearly expressed in the text of the statute, we begin our analysis with an examination of the plain language of the relevant provision." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295 (3d Cir. 2012) (quotation omitted). Section 1591 criminalizes sex trafficking of minors "in or affecting interstate or foreign commerce." 18 U.S.C. § 1591(a). The statute does not define "interstate," but its ordinary meaning is "[b]etween two or more states or residents of different states." *Interstate*, Black's Law Dictionary 826 (7th ed. 1999); *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 194 (1824) (noting that commerce is interstate when it "concerns more States than one"). So the statute applies domestically because it unambiguously punishes the sex trafficking of minors affecting commerce between two or more States.

Adams's conduct falls within the scope of § 1591. He created an account on a European website to advertise the minors' sexual services and coordinate with buyers. Adams also used a cellphone manufactured in a foreign country to direct the minors to engage in commercial sex acts. Those facts satisfy the jurisdictional foreign or interstate-commerce element of the offenses because Adams's commercial sex trafficking of minors contributed to the market that Congress's comprehensive statutory scheme seeks to eradicate. *See Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (holding that

Congress has the power to regulate individual instances of "purely local activities" that in the aggregate frustrate the broader regulation of interstate and foreign commerce).

B

Adams's second statutory argument fares no better. He contends that even if Congress intended to punish domestic sex trafficking, we must construe § 1591 narrowly to avoid federalizing "local crimes" that Pennsylvania law already punishes. Adams Br. 12 (citing *Bond v. United States*, 572 U.S. 844 (2014)).

In *Bond*, the Supreme Court considered whether a provision of the Chemical Weapons Convention Implementation Act, 18 U.S.C. § 229, reached the defendant's "purely local crime" of poisoning her husband's paramour. *Bond*, 572 U.S. at 848. The Court held it did not because there was no "clear indication that Congress meant to reach purely local crimes." *Id.* at 860. The Court required such a clear statement because reading an ambiguous statutory term as the government suggested would "intrude[] on the police power of the States" and "significantly change the federal-state balance." *Id.* at 859–60 (cleaned up).

Unlike the law challenged in *Bond*, the Trafficking Act reflects Congress's clear intent to exercise all its power to regulate child sex trafficking, including "purely local" conduct, so long as the minimal jurisdictional hook is satisfied. *See Raich*, 545 U.S. at 17; *see also Circuit City Stores, Inc. v. Adams*, 532 U.S 105, 115 (2001) (explaining that by using the phrase "affecting commerce," Congress indicates its "intent to regulate to the outer limits of its authority under the Commerce

8

Clause").[1] Moreover, "the congressional findings incorporated into the [Trafficking Act] clearly demonstrate Congress's intent to enact a criminal statute addressing sex trafficking at all levels of activity." *United States v. Walls*, 784 F.3d 543, 547 (9th Cir. 2015); *see also* 22 U.S.C. § 7101(b)(12) (finding that, in the aggregate, sex trafficking "substantially affects interstate and foreign commerce" and "has an impact on the nationwide employment network and labor market").

Section 1591 reaches Adams's conduct, even if purely local, so the District Court did not err when it denied Adams's motion to dismiss.

IV

Having rejected Adams's statutory challenges, we turn to his assertion that Congress lacked the constitutional authority to enact § 1591. Adams contends that applying the statute to interstate (rather than international) sex trafficking would violate the Tenth Amendment, the Treaty Power, and the Necessary and Proper Clause of the United States Constitution. Adams's arguments are misguided.

---

[1] *Jones v. United States*, which Adams invokes in passing, is inapt. 529 U.S. 848 (2000). There, the Supreme Court interpreted a federal arson statute to exclude private owner-occupied residences because the government had not shown that the building was "currently used in commerce or in an activity affecting commerce." *Id.* at 859 (2000). But the Court's holding hinged on the statute's "qualifying words 'used in' a commerce-affecting activity." *Id.* at 854. That "key word" is absent from the relevant part of § 1591. *Id.*

First, the source of Congress's authority to enact § 1591 derives from the Commerce Clause, not the Treaty Power. The statute imposes criminal liability upon anyone who "knowingly . . . in or affecting interstate or foreign commerce" causes a minor to engage in commercial sex acts. 18 U.S.C. § 1591(a); *see Circuit City Stores*, 532 U.S. at 115 ("The phrase 'affecting commerce' indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause."); *see also Walls*, 784 F.3d at 547 ("[W]hen Congress used the language 'in or affecting interstate or foreign commerce' in the [Trafficking Act], it intended to exercise its full powers under the Commerce Clause.").

Section 1591 is a valid exercise of that power. Article I of the Constitution gives Congress the power to "make all Laws which shall be necessary and proper" to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8 cl. 3, 18. Congress's commerce power, supplemented by the Necessary and Proper Clause, includes the authority "to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce."[2] *Raich*, 545 U.S. at 17. Section 1591 is "part of a comprehensive regulatory scheme that criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial

---

[2] For that reason, the Trafficking Act does not offend the Tenth Amendment by punishing conduct that occurs "wholly within a state." Adams Br. 10. It is "well within" Congress's power to regulate "purely intrastate" activities that "undercut the regulation of the interstate market," especially here, where Adams's sexual exploitation of minors was commercial in nature. *Raich*, 545 U.S. at 18.

gain." *Walls*, 784 F.3d at 548; *see* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (codified as amended in scattered titles of U.S.C.). In enacting the Trafficking Act, Congress recognized that human trafficking "is the largest manifestation of slavery today." 22 U.S.C. § 7101(b)(1). Congress also found that human trafficking substantially affects interstate and foreign commerce. *See id.* § 7101(b)(12). And several of our sister courts have concluded that there is a rational basis for that finding. *See, e.g.*, *Walls*, 784 F.3d at 548–49; *United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007). Today we conclude likewise.

For the reasons stated, we hold that Congress validly enacted the Trafficking Act consistent with its authority under the Commerce Clause. Accordingly, the District Court did not err in denying Adams's motion to dismiss.

V

We last consider Adams's challenge to the District Court's denial of his motion to withdraw his guilty plea. Adams contends that the Government breached the plea agreement by seeking an undue influence two-level enhancement and by reneging on its stipulation that Adams had accepted responsibility for his offense. He also claims he is innocent. We are unpersuaded.

The Government reserved the right to "[m]ake whatever sentencing recommendation" it "deem[ed] appropriate provided its recommendation is within the applicable Sentencing Guidelines range," and the parties were "free to argue . . . the applicability of any other provision of the Sentencing Guidelines, including offense conduct, offense

11

characteristics, criminal history, adjustments, and departures." Supp. App. 29, 35. The Government therefore did not breach the plea agreement by seeking the undue-influence enhancement, U.S.S.G. § 2G1.3(b)(2)(B).

Nor did the Government breach the plea agreement by arguing against a downward adjustment for acceptance of responsibility in its sentencing memorandum. The parties agreed that Adams demonstrated his acceptance of responsibility "as of the date of th[e] agreement." Supp. App. 36. Because Adams later attempted to withdraw his plea based on the unsupported allegations that his victims lacked credibility and that he was prosecuted because of his race, the Government had a reasonable basis to change its sentencing recommendation. *See United States v. King*, 604 F.3d 125, 141–42 (3d Cir. 2010).

Finally, Adams contends he has a right to withdraw his plea because he "made a claim of innocence." Adams Br. 14. But that "[b]ald assertion[] of innocence" is unsupported and falls well short of Adams's burden. *United States v. Brown*, 250 F.3d 811, 818 (3d Cir. 2001). His claim of innocence before the District Court rested on his argument that § 1591 "does not reach the charged conduct in this case." App. 29. But we have rejected that argument. So the District Court was within its discretion to deny Adams's motion to withdraw the guilty plea.[3] *Brown*, 250 F.3d at 815.

\*     \*     \*

For the reasons stated, we will affirm the District

_____

[3] Adams also argues that he has a right to withdraw his plea because of ineffective assistance of counsel. We decline to

Court's judgment of conviction and sentence.

---

reach the merits of that claim because the record is insufficient to determine the issue. *See United States v. Jones*, 336 F.3d 245, 254 (3d Cir. 2003). We do so without prejudice to Adams's ability to make this argument again on a collateral attack under 28 U.S.C. § 2255. *See United States v. Thornton*, 327 F.3d 268, 271 (3d Cir. 2003).